UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :         09 Civ. 3481 (HB)

        Plaintiff,                          :

    - v. -                                   :

ANY AND ALL FUNDS ON DEPOSIT IN              :
ACCOUNT NO. 12671905, HELD IN THE
NAME OF LANDLOCKED SHIPPING                  :
COMPANY AT WELLS FARGO BROKERAGE
SERVICES, LLC, AND ALL INTEREST AND          :
OTHER PROCEEDS TRACEABLE THERETO,
                                             :
ANY AND ALL FUNDS ON DEPOSIT IN              :
ACCOUNT NO. 0578010886, HELD IN THE
NAME OF LANDLOCKED SHIPPING                  :
COMPANY AT WELLS FARGO BANK, N.A.,
AND ALL INTEREST AND OTHER PROCEEDS          :
TRACEABLE THERETO, and
                                             :
ONE MERCEDES S600 FOUR-DOOR SEDAN,           :
BEARING VEHICLE IDENTIFICATION
NUMBER WDBGA57G5XA421548,                     :

        Defendants-in-rem.                    :

-------------------------------------------------------------x

## MEMORANDUM OF LAW OF PLAINTIFF UNITED STATES OF AMERICA IN SUPPORT OF ITS CROSS-MOTION TO STRIKE OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO CLAIMANTS' MOTION FOR SUMMARY JUDGMENT

               PREET BHARARA
               *United States Attorney for the*
               *Southern District of New York*

               *Attorney for the United States of America*

Amy Lester
*Assistant United States Attorney*
     *Of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    CLAIMANTS LACK CONSTITUTIONAL STANDING TO
      CHALLENGE THE FORFEITURE OF THE PEAK HOUSE FUNDS . . . . . . . . . . . . . 8

      A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            1.    Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            2.    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.    Dr. Chvatik Lacks Article III Standing As The Mere Beneficiary
                  Of A Trust Holding Landlocked's Shares . . . . . . . . . . . . . . . . . . . 13

            2.    Claimants Lack Article III Standing Because They Did Not
                  Exercise Dominion And Control Over Peak House . . . . . . . . . . . . . . 15

II.   THE COURT SHOULD APPLY THE FUGITIVE
      DISENTITLEMENT DOCTRINE TO DISMISS THE CLAIM . . . . . . . . . . . . . . . . . 17

      A.    The Fugitive Disentitlement Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            1.    The Statutory Prerequisites To Disentitlement Are Satisfied . . . . . . . . 20

            2.    Kozeny Is The True Party In Interest In This Action . . . . . . . . . . . . . 21

            3.    The Court Should Exercise Its Discretion To Dismiss The Claim . . . . . 22

III.    THIS COURT LACKS JURISDICTION TO HEAR CLAIMANTS'
        ARGUMENT THAT THIS ACTION IS UNTIMELY AND, IN ANY
        EVENT, THE ACTION IS NOT TIME BARRED ........................... 23

        A.    Applicable Law ................................................. 24

        B.    Discussion ................................................... 25

              1.    Kozeny's Absence From The United States Tolls The
                    Statute Of Limitations ...................................... 25

              2.    The Court Should Invoke The Doctrine Of
                    Equitable Tolling In Favor Of The Government ................. 28

CONCLUSION ......................................................... 30

# TABLE OF AUTHORITIES

## CASES

Abbas v. Dixon, 480 F.3d 636 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 12

CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257 (11th Cir. 2006) . . . . . . . . . . . 8

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Collazos v. United States, 368 F.3d 190 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . 18, 21, 22

Connecticut Nat'l Bank v. Germain, 503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . 25

Contents of Account Number 03001288 v. United States, 344 F.3d 399 (3d Cir. 2003) . . . 25-27

Dole Food Co. v. Patrickson, 538 U.S. 468 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Gallo v. Prudential Residential Servs., 22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 12

Golden Pac. Bancorp. v. FDIC, 375 F.3d 196 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 12

Jeffreys v. City of New York., 426 F.3d 549 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 12

Longenette v. Krusing, 322 F.3d 758 (3rd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290 (2d Cir. 2008) . . . . . . . . . . 12

Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . . . . 13

M.D. v. Southington Bd. of Educ., 334 F.3d 217 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . 28

Mercado v. U.S. Customs Serv., 873 F.2d 641 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 9

Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438 (2d Cir. 1980) . . . . . . . . . . . . 13

Scott v. Harris, 550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. 10 Meadow Lane, No. CRIM. 104CV272,
    2005 WL 1530252 (N.D. W. Va. June 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. 657 Acres of Land, More or Less, 978 F. Supp. 999 (D. Wyo. 1997) . . . . . . . 19

United States v. 904 Toro Canyon Road, No. CIVA04CV02549EWN-OES,
2006 WL 36764 (D. Colo. Jan. 5, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

United States v. $79,000 in Account Number 2168050/6749900 at the Bank of New York,
No. 96 Civ. 3493 (MBM), 1996 WL 648934 (S.D.N.Y. Nov. 7, 1996) . . . . . . . . . . . . 10

United States v. $138,381.00 in U.S. Currency,
240 F. Supp. 2d 220 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 23

United States v. $340,903.32 in U.S. Currency,
No. 94-0523-CIV, 1995 WL 500692 (S.D. Fla. July 11, 1995) . . . . . . . . . . . . . . . . . 19

United States v. $349,370.09 in U.S. Currency, 22 Fed. Appx. 731 (9th Cir. 2001) . . . . . . . . 26

United States v. $557,993.89, More or Less, in U.S. Funds, 287 F.3d 66 (2d Cir. 2002) . . . . 9, 11

United States v. $960,000 in U.S. Currency, 307 Fed. Appx. 251 (11th Cir. 2006) . . . . . . . . . 11

United States v. $1,278,795,
No. Civ. A. L-03-87, 2006 WL 870364 (S.D. Tex. Mar. 30, 2006) . . . . . . . . . . . . . . 22

United States v. $1,474,770.00 in U.S. Currency, 538 F. Supp. 2d 1298 (S.D. Cal. 2008) . . . . 19

United States v. $6,976,934.65 Plus Interest, 478 F. Supp. 2d 30 (D.D.C. 2007) . . . . . . . . . . . 19

United States v. All Funds Distributed to, or on behalf of, Edward Weiss,
345 F.3d 49 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278
Banco Espanol de Credito, Spain, 295 F.3d 23 (D.C. Cir. 2002) . . . . . . . . . . . . . . 25-27

United States v. All Funds on Deposit at Citigroup Smith Barney,
No. 06-CY-3730 (NGG), 2007 WL 2687660 (E.D.N.Y. Sept. 10, 2007) . . . . . . . . . . . 22

United States v. All Right, Title, and Interest in Real Prop. and Appurtenances
Located at Trump World Towers, No. 03 Civ. 7967 (RCC),
2004 WL 1933559 (S.D.N.Y. Aug. 31, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. All Right, Title and Interest in Real Prop., Appurtenances, and
Improvements Known as 479 Tamarind Drive, Hallandale, Florida,
No. 98 Civ. 2279 (RLC), 2005 WL 2649001 (S.D.N.Y. Oct. 14, 2005) . . . . . . . 15, 21-23

United States v. Cambio Exacto, S.A., 166 F.3d 522 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 8, 9

United States v. Collado, 348 F.3d 323 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Contents of Accounts Nos. 3034504504 and 144-07143 at Merrill, Lynch,
      971 F.2d 974 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Contents of Account No. 68108021,
      228 F. Supp.2d 436 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Domino Sugar Corp., 349 F.3d 84 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 28

United States v. East Carroll Corr. Sys., 14 F. Supp. 2d 851 (W.D. La. 1998) . . . . . . . . . . . 15

United States v. Islip, 18 F. Supp. 2d 1047 (Ct. Int'l Trade 1998) . . . . . . . . . . . . . . . . . . . 26

United States v. New Silver Palace Restaurant, Inc., 810 F. Supp. 440 (E.D.N.Y. 1992) . . 10, 15

United States v. One 1982 Porsche 928, 732 F. Supp. 447 (S.D.N.Y. 1990) . . . . . . . . . . . . . 10

United States v. One 1988 Chevrolet Cheyenne, 357 F. Supp. 2d 1321 (S.D. Ala. 2005) . . . . . 22

United States v. One Parcel of Real Prop. with Bldgs., Appurtenances and Known as
      170 Westfield Drive, 34 F. Supp. 2d 107 (D.R.I. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Premises and Real Prop. with Bldg., Appurtenances and
      Improvements at 191 Whitney Place,
      No. 98-CV-0060 E, 2000 WL 1335748 (W.D.N.Y. Sept. 7, 2000) . . . . . . . . . . . . . . . 10

United States v. Real Prop. Associated with First Beneficial Mortgage Corp.,
      No. 3:08cv285, 2009 WL 1035233 (W.D.N.C. Apr. 16, 2009) . . . . . . . . . . . . . . . . . . . 14

United States v. Real Prop. Located at 5208 Los Franciscos Way,
      385 F.3d 1187 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Ron Pair Enterprises, Inc., 489 U.S. 235 (1989) . . . . . . . . . . . . . . . . . . . 25

United States v. Salti, 579 F.3d 656 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Speed Joyeros, S.A., 410 F. Supp. 2d 121 (E.D.N.Y. 2006) . . . . . . . . . . . . . 14

United States v. Two Bank Accounts,
      Nos. CIV 06-4016-KES, 06-4005, 2008 WL 5431199 (D.S.D. Dec. 31, 2008) . . . . . . . 15

United States v. Up to $6,100,000 on Deposit in Account No. 15.5876
      at Bank Julius Baer Co. Ltd., No. 07 Civ. 4430 (RJS),
      2009 WL 1809992 (S.D.N.Y. June 24, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

United States v. U.S. Currency in the Sum of $18,800, No. 02-CV-5752 (SJF) (RML),
      2004 U.S. Dist. LEXIS 25055 (E.D.N.Y. Dec. 8, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 9

Wyler v. United States, 725 F.2d 156 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Zellner v. Summerlin, 494 F.3d 344 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## FOREIGN CASES

Bank Voor Handel En Scheepvaart N v. Slatford, (1953) 1 Q.B. 248 . . . . . . . . . . . . . . . . . . . . 14

E.B.M. Co. Ld. v. Dominion Bank, (1937) 3 All E.R. 555 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Macaura v. Northern Assurance Co., (1925) AC 619 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## STATUTES

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Rule G of the Supplemental Rules for Admiralty or Maritime and
    Asset Forfeiture Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 24

19 U.S.C. § 1621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27

28 U.S.C. § 2466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## SECONDARY SOURCES

Stefan A. Cassella, Asset Forfeiture Law in the United States, § 9-2 (2007) . . . . . . . . . . . . . . 22

## PRELIMINARY STATEMENT

In 2005, Viktor Kozeny ("Kozeny") was charged in a twenty-seven count indictment with, among other things, violating the Foreign Corrupt Practices Act by bribing officials of the government of the Republic of Azerbaijan in connection with a scheme to invest in and profit from the privatization of Azerbaijan's state-run businesses and engaging in money launering. Kozeny recruited investors to the scheme in part by using his home in Aspen, Colorado, known as Peak House, to entertain and hold business meetings. Kozeny also used money obtained through the scheme to pay for expenses associated with Peak House. As alleged in the amended verified complaint filed by plaintiff United States of America (the "Government") in this action, the proceeds from the sale of Peak House (the "Peak House Funds") are subject to forfeiture based on Kozeny's criminal conduct.

The criminal charges against Kozeny are still pending, because he is a fugitive residing in the Bahamas and has continued to resist the Government's efforts to extradite him to the United States. Kozeny's mother, Dr. Jitka Chvatik ("Dr. Chvatik"), and a shell company that Kozeny effectively controls, Landlocked Shipping Company ("Landlocked") (collectively, "Claimants"), have filed a claim challenging the forfeiture of the Peak House Funds. As demonstrated by the evidence set forth below, there can be no genuine dispute that Claimants are merely Kozeny's nominees, and that it is Kozeny's ownership interest that is truly at stake in this action. Therefore, the Court should grant the Government's motion to strike or for summary judgment and dismiss the Claim for lack of standing or, alternatively, on the basis of the fugitive disentitlement doctrine.

## PROCEDURAL HISTORY

The Government first gave notice that it would seek forfeiture of the Peak House Funds in connection with the criminal case against Kozeny, United States v. Kozeny, et al., 05 Cr. 518 (SAS). The Government listed the Peak House Funds in the forfeiture allegation of the Indictment, alleging that

they constitute property involved in the money laundering offenses charged in Counts 21 through 25 of the Indictment, or property traceable thereto.

On April 6, 2009, the Government filed this in rem civil forfeiture action against the Peak House Funds and a four-door Mercedes sedan,[1] and on May 12, 2009, the Government filed its amended verified complaint (the "Complaint"). (Declaration of Amy Lester dated November 23, 2009 ("Lester Decl."), Ex. 1). The Complaint alleges that the Peak House Funds are subject to forfeiture as property involved in money laundering transactions conducted by Kozeny in violation of 18 U.S.C. §§ 1956 and 1957, or property traceable to such property.

On May 7, 2009, Claimants filed a verified claim (the "Claim") to ownership of the Peak House Funds. (Lester Decl. Ex. 2). On May 27, 2009, Claimants filed an answer. (Lester Decl. Ex. 3). The same day, Claimants also filed a motion for summary judgment, arguing that this action is barred by the statute of limitations. The Government submits this memorandum of law in support of its cross-motion to strike or for summary judgment on the grounds described above and in opposition to Claimants' motion for summary judgment. For the reasons that follow, the Court need not and should not reach the statute of limitations issue, but in the event that it does, the Court should deny Claimants' motion for summary judgment because the limitations period has been tolled during the period of Kozeny's absence from the United States. Alternatively, the Court should invoke the doctrine of equitable tolling and find that the instant civil forfeiture action is timely.

## FACTUAL BACKGROUND

Based on the pleadings, the evidence adduced in discovery, Claimants' answers to the Government's interrogatories, and documents in the public record, the following is a summary of the undisputed facts relevant to the Government's cross-motion to strike or for summary judgment and its

---

[1] Claimants have not challenged the forfeiture of the Mercedes.

opposition to Claimants' motion for summary judgment, as set forth in the Local Civil Rule 56.1 Statement of Undisputed Material Facts in Support of Motion to Strike or for Summary Judgment by Plaintiff United States of America (cited as "56.1 Stmt. ¶ __"), filed in support of this motion.

In 1997 and 1998, the Republic of Azerbaijan issued vouchers and options for purchase in connection with its program to privatize various state-owned businesses (the "Azeri privatization program"). (56.1 Stmt. ¶ 9). Kozeny recruited investors to invest in the Azeri privatization program by purchasing vouchers and options through various companies, including Oily Rock Group Ltd. ("Oily Rock") and Minaret Group Ltd. ("Minaret"), of which Kozeny was a director. (56.1 Stmt. ¶¶ 9, 10). Oily Rock and Minaret were incorporated at Kozeny's request by von Meiss Blum & Partners ("von Meiss Blum"), a law firm located in Zurich, Switzerland, and were represented by von Meiss Blum. (56.1 Stmt. ¶¶ 9, 11, 12). Von Meiss Blum acted as the liaison for all of the parties who were recruited to invest in the Azeri privatization program by Kozeny. (56.1 Stmt. ¶ 18).

Hans Bodmer ("Bodmer"), one of the lawyers at von Meiss Blum, also represented Kozeny in connection with another investment company called Daventree, of which Kozeny is a director. (56.1 Stmt. ¶ 14). Kozeny's mother, Dr. Chvatik, is a beneficiary of a trust that owns Daventree. (56.1 Stmt. ¶ 16). In his capacity as a director of Daventree, Kozeny instructed Bodmer on corporate actions and the distribution of assets of the company. (56.1 Stmt. ¶ 15). At Kozeny's direction, money from Daventree was flown to Baku, Azerbaijan, in connection with the Azeri privatization program. (56.1 Stmt. ¶ 15).

Kozeny was also the managing director of a company called Harvard Capital Management (Worldwide) Limited ("Harvard Capital"). (56.1 Stmt. ¶ 17). Harvard Capital is an asset of a trust of which Dr. Chvatik is a beneficiary. (56.1 Stmt. ¶ 17).

Landlocked was incorporated on the instructions of von Meiss Blum. (56.1 Stmt. ¶ 2). Apollo Nominees Limited, a Turks and Caicos Island company, is the sole shareholder of Landlocked. (56.1

Stmt. ¶ 3). Dr. Chvatik is the beneficiary of a trust that holds the capital shares of Landlocked. (56.1 Stmt. ¶ 4). The Memorandum and Articles of Association of Landlocked state that the company was established with $300,000,000 in capital. (56.1 Stmt. ¶ 5). Dr. Chvatik does not know the source of the capital referenced in the Memorandum and Articles of Association of Landlocked. (56.1 Stmt. ¶ 6).

Beginning in early 1997, Kozeny visited Aspen, Colorado, to look at potential properties to purchase, including Peak House. (56.1 Stmt. ¶ 20). Kozeny communicated with Heidi Houston ("Houston"), a real estate broker with the firm of Houston & O'Leary in Apsen, about purchasing a property there. (56.1 Stmt. ¶¶ 20, 21). For example, in May 1997, Houston told Kozeny that the owners of Peak House were willing to honor the original sale price of $19,750,000 for him, even though they had recently raised the price to $22,500,000. (56.1 Stmt. ¶ 21).

In May 1997, Landlocked entered into a contract to purchase Peak House for $19,750,000. (56.1 Stmt. ¶ 22). The purchase closed on or about June 6, 1997. (56.1 Stmt. ¶ 22). Kozeny is listed as the buyer of Peak House on a document from the closing of the purchase. (56.1 Stmt. ¶ 24). Dr. Chvatik did not attend the closing. (56.1 Stmt. ¶ 23). Bodmer arranged the funding to purchase Peak House. (56.1 Stmt. ¶ 25). According to Dr. Chvatik, the funds to finance the purchase of Peak House came from Daventree. (56.1 Stmt. ¶ 16).

After the purchase of Peak House took place, the water and electricity service were transferred to Kozeny's name. (56.1 Stmt. ¶ 27). Kozeny's personal assistant, Dorothy McNamara, instructed Houston that no one should be shown Peak House without Kozeny's authorization. (56.1 Stmt. ¶ 28). Kozeny spent a portion of each of the following months at Peak House: July 1997, December 1997, January 1998, February 1998, March 1998, April 1998, July 1998, August 1998, October 1998, December 1998, and January 1999. (56.1 Stmt. ¶ 29). While he was in residence, Kozeny entertained numerous guests, and treated the home as his own. (56.1 Stmt. ¶¶ 30, 31, 32). Kozeny used Peak House to conduct meetings and other events attended by the investors in the Azeri privatization

program, including a lavish black tie Christmas party on December 22, 1997, to which he invited numerous potential investors. (56.1 Stmt. ¶¶ 31, 32).

Kozeny also communicated with Dana Brackett, the manager for Peak House, about ongoing construction projects at the property, including the transfer of funds to pay for such projects and other expenses. (56.1 Stmt. ¶¶ 41, 42, 43).

Kozeny retained John Christensen ("Christensen") and his interior decoration and design firm, Christensen Design Group ("Christensen Design"), to purchase furnishings for and decorate Peak House. (56.1 Stmt. ¶ 44). Kozeny paid Christensen Design more than $7 million for the work associated with Peak House and a property in London, England that was owned by Kozeny. (56.1 Stmt. ¶ 49). Christensen Design also provided services in connection with the December 1997 Christmas party held by Kozeny at Peak House. (56.1 Stmt. ¶ 50). Some of the personalty located in Peak House was held by Turnstar Limited ("Turnstar"), a Bahamian corporation. (56.1 Stmt. ¶ 52). At Kozeny's direction, Christensen Design sent the invoices for work on Peak House and the London home to an address for Turnstar in the Bahamas. (56.1 Stmt. ¶ 53). Kozeny paid some invoices from Christensen Design for work on Peak House with funds from Minaret. (56.1 Stmt. ¶ 51). Dr. Chvatik was introduced to Christensen at Kozeny's wedding, but never retained him for any business purpose. (56.1 Stmt. ¶ 54). Dr. Chvatik is also unaware of whether Kozeny ever retained Christensen. (56.1 Stmt. ¶ 54).

Kozeny directed Bodmer to transfer funds to pay for expenses associated with Peak House, including funds from accounts held by Oily Rock and Minaret that were transferred for the benefit of Peak House Corporation, which provided transportation, maintenance, and services for Peak House. (56.1 Stmt. ¶¶ 7, 35, 36, 38, 40). Dr. Chvatik was not a beneficiary of Peak House Corporation and has no knowledge of who controlled the company. (56.1 Stmt. ¶ 8). In addition to payments handled by von Meiss Blum, another law firm, Chopin & Miller, which was located in Florida, paid expenses on

behalf of Landlocked. (56.1 Stmt. ¶ 33). Chopin & Miller also represented Kozeny. (56.1 Stmt. ¶ 34).

Beginning in or about the summer of 1998, Kozeny informed several investors in the Azeri privatization program that privatization was not going to take place and their investment was worthless. The investors then confronted Kozeny with their suspicions that he had defrauded them. (56.1 Stmt. ¶ 55).

Beginning in the fall of 1999, Kozeny communicated with Houston about selling Peak House. (56.1 Stmt. ¶¶ 56, 57). Houston also communicated with Jackie Miller ("Miller"), a lawyer with Chopin & Miller, in connection with the potential sale of Peak House. (56.1 Stmt. ¶ 58 ).

Among the investors in the Azeri privatization program was a company called Marlwood Commercial Inc. ("Marlwood"). (56.1 Stmt. ¶ 60). In December 1999, Marlwood filed suit against Kozeny in London, England, and successfully obtained an order freezing up to $17 million of his assets worldwide. (56.1 Stmt. ¶ 60). On December 17, 1999, Marlwood also filed proceedings against Kozeny in the Supreme Court of the Commonwealth of the Bahamas to enforce the London court's order. (56.1 Stmt. ¶ 61). On December 23, 1999, the High Court of the British Virgin Islands placed Minaret and Oily Rock in receivership and froze all of their assets. (56.1 Stmt. ¶ 62).

In 2000, Marlwood and other investors in the Azeri privatization program brought suit against Kozeny, Landlocked, and Peak House Corporation in federal court in Colorado (the "Colorado Litigation") and obtained a preliminary injunction that prohibited the sale, disposition, or transfer of ownership of Peak House. (56.1 Stmt. ¶ 63). On June 12, 2000, the presiding judge, the Honorable Lewis T. Babcock, issued findings of fact, conclusions of law, and an order (the "Findings") in which he found that the plaintiffs had established "Kozeny's use and control over Peak House." (56.1 Stmt. ¶ 64). Judge Babcock also found that "although title to Peak House is held in the name of Landlocked, there is substantial evidence that Kozeny is the beneficial owner," and that "[r]easonable inferences from the undisputed evidence demonstrate that . . . Landlocked held title to the Aspen property to

conceal Kozeny's interest in it and to conceal the proceeds of [Kozeny's] fraud [involving the Azeri privatization program]." (56.1 Stmt. ¶¶ 65, 66). In a second set of findings issued on June 23, 2000, Judge Babcock found that Kozeny also controlled Turnstar, which owned millions of dollars worth of personalty located in Peak House. (56.1 Stmt. ¶ 68, 69). Kozeny was represented in the Colorado action by James E. Nesland, Esq. ("Nesland"), who also represents Claimants in the instant action. (56.1 Stmt. ¶ 70).

On June 12, 2001, Landlocked entered into a contract to sell Peak House for $24,000,000, which was later reduced to $22,000,000. (56.1 Stmt. ¶ 71). The sale was authorized by Judge Babcock and closed on or about November 2, 2001. (56.1 Stmt. ¶¶ 73, 74). Dr. Chvatik did not attend the closing. (56.1 Stmt. ¶ 75). The net proceeds from the sale of Peak House were deposited in accounts held in Landlocked's name at Wells Fargo Bank, N.A. (56.1 Stmt. ¶ 76).

As a result of his conduct in connection with the Azeri privatization program, on May 12, 2005, Kozeny was charged in a sealed indictment with one count of engaging in a conspiracy to violate the Foreign Corrupt Practices Act and Travel Act, twelve counts of violations of the Foreign Corrupt Practices Act, six counts of violations of the Travel Act, one count of money laundering conspiracy, and four counts of the substantive crime of money laundering. (56.1 Stmt. ¶ 80). At the time that the Indictment was issued, Kozeny was a resident of the Bahamas, where he had been living since at least September 2000. (56.1 Stmt. ¶¶ 81, 84). In connection with the Government's request to extradite Kozeny to the United States, a provisional warrant was issued for Kozeny's arrest and he was taken into custody by the Bahamian authorities on October 5, 2005. (56.1 Stmt. ¶¶ 82, 83). The Indictment was then unsealed. (56.1 Stmt. ¶ 83). Within two weeks of the unsealing of the Indictment, the Government notified Judge Babcock that the Peak House Funds had been listed in the Indictment as subject to forfeiture as a result of Kozeny's criminal activities. (56.1 Stmt. ¶ 90). Kozeny was held in custody at a prison in the Bahamas while the Government's extradition request was pending. (56.1 Stmt. ¶ 84).

7

In September 2006, the presiding Magistrate in the Bahamas granted the Government's request for extradition. (56.1 Stmt. ¶ 85). Kozeny challenged the Magistrate's decision, and in October 2007, the decision granting extradition was reversed by an order of the Supreme Court in the Bahamas, and Kozeny was released from custody. (56.1 Stmt. ¶¶ 86, 87). The Government's appeal of the decision reversing the Magistrate's finding is pending. (56.1 Stmt. ¶ 88). Nesland was one of the lawyers who represented Kozeny in connection with the criminal case. (56.1 Stmt. ¶ 89).

## ARGUMENT

**I.     CLAIMANTS LACK CONSTITUTIONAL STANDING TO
CHALLENGE THE FORFEITURE OF THE PEAK HOUSE FUNDS**

Claimants have no standing to challenge the forfeiture in this action because they lack a sufficient interest in the Peak House Funds under Article III of the United States Constitution. Dr. Chvatik's relationship to the Peak House Funds as the mere beneficiary of a trust that holds the capital shares of Landlocked does not give rise to standing under the applicable legal standards. In addition, both Dr. Chvatik and Landlocked lack standing because they did not exercise dominion and control over Peak House. Rather, as demonstrated by the evidence set forth below, there can be no genuine dispute that Kozeny was the true owner of Peak House, and that Kozeny is the party who stands to suffer injury if the Peak House Funds are forfeited. Claimants are merely Kozeny's nominees in this action and, therefore, their Claim should be stricken or dismissed for lack of standing.

**A.     Applicable Law**

**1.     Standing**

"Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999) (citations omitted). Thus, standing must be determined first, before the court turns to any other issues, because without it, the court lacks jurisdiction to hear any other aspect of the case. See

CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) ("In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims and . . . is powerless to continue.") (internal citations and quotations omitted). "The aim of this threshold requirement is 'to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture.'" United States v. U.S. Currency in the Sum of $18,800, No. 02-CV-5752 (SJF) (RML), 2004 U.S. Dist. LEXIS 25055, at *8-*9 (E.D.N.Y. Dec. 8, 2004) (quoting United States v. $557,993.89, More or Less, in U.S. Funds, 287 F.3d 66, 79 (2d Cir. 2002)). The claimant in a judicial forfeiture action bears the burden of establishing standing both under the applicable statute and under Article III. Mercado v. U.S. Customs Serv., 873 F.2d 641, 644 (2d Cir. 1989). Compliance with the rules for filing claims and answers governs the statutory standing analysis. Article III standing depends upon whether the party has a sufficient interest in the outcome of the litigation to satisfy the "case or controversy" requirement. Cambio Exacto, 166 F.3d at 526-27. "In contrast to statutory standing, the requirements for Article III standing cannot be excused at the discretion of the trial judge." United States v. $138,381.00 in U.S. Currency, 240 F. Supp. 2d 220, 231 (E.D.N.Y. 2003).

To establish Article III standing, a claimant must demonstrate a "distinct and palpable injury to himself . . . that is the direct result of the putatively illegal conduct of the [adverse party] . . . and likely to be redressed by the requested relief." Cambio Exacto, 166 F.3d at 527 (internal citations and quotation marks omitted). "In determining standing to contest a forfeiture, courts look to ownership and possession of the seized property as reliable indicators of standing to claim injury," but ultimately, the test for constitutional standing is the injury to the claimant. $18,800, 2004 U.S. Dist. LEXIS 25055, at *10; Cambio Exacto, 166 F.3d at 527 ("while ownership and possession generally may provide evidence of standing, it is the injury to the party seeking standing that remains the ultimate focus"). A bare assertion of ownership by a claimant who is merely a straw owner does not demonstrate injury

sufficient to satisfy the Article III standing requirement. <u>Cambio Exacto</u>, 166 F.3d at 527 ("It is because of the lack of proven injury that we have . . . denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else. Such owners do not themselves suffer an injury when the property is taken."); <u>United States</u> v. <u>Premises and Real Prop. with Bldg., Appurtenances and Improvements at 191 Whitney Place</u>, No. 98-CV-0060 E, 2000 WL 1335748, at *2 (W.D.N.Y. Sept. 7, 2000) ("A straw owner does not suffer any injury when the property is taken and therefore does not have Article III standing.").

For this reason, it is settled law that "[p]ossession of mere legal title by one who does not exercise dominion and control over the property is insufficient . . . to establish standing." <u>Id</u>. (citations and internal quotation marks omitted) (alteration in original); <u>United States</u> v. <u>New Silver Palace Rest., Inc.</u>, 810 F. Supp. 440, 444 (E.D.N.Y. 1992); <u>United States</u> v. <u>$79,000 in Account Number 2168050/6749900 at the Bank of New York</u>, No. 96 Civ. 3493 (MBM), 1996 WL 648934, at *3 (S.D.N.Y. Nov. 7, 1996); <u>see also</u> <u>United States</u> v. <u>Contents of Accounts Nos. 3034504504 and 144-07143 at Merrill, Lynch</u>, 971 F.2d 974, 985 (3rd Cir. 1992) (Recognizing that case law supports the proposition that "courts have uniformly rejected standing claims put forward by nominal or straw owners. Thus, even possession of legal title to the *res* may be insufficient to establish standing to contest the forfeiture.") (citing David B. Smith, <u>Defense and Prosecution of Forfeiture Cases</u>, ¶ 9.04 at 9-58.6 (1985 & Supp. 1991)). This rule is designed to prevent an individual involved in criminal wrongdoing from being able to assert a claim in a forfeiture action through a "strawman" or nominee, "which would defeat the statutory purposes of forfeiture of property used in the commission of [offenses that give rise to forfeiture]." <u>New Silver Palace Rest.</u>, 810 F. Supp. at 444; <u>see also</u> <u>191 Whitney Place</u>, 2000 WL 1335748, at *1 (requiring dominion and control to establish standing "prevent[s] individuals engaged in illegal activities from hiding their assets and circumventing the forfeiture laws by placing the legal title to property in another's name"); <u>United States</u> v. <u>One 1982 Porsche 928</u>, 732 F. Supp.

447, 451 (S.D.N.Y. 1990) ("A search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture.").

Pursuant to Rule G(8)(c)(ii)(B) of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims, which govern civil forfeiture proceedings, the Government may move to dismiss a claim for lack of Article III standing at the pleadings stage, as a motion to determine after a hearing, or by summary judgment to determine "whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Rule G(8)(c)(ii)(B). Such a motion must be decided before any motion by the claimant to dismiss the action, because "[a] claimant who lacks standing is not entitled to challenge the forfeiture on the merits." Rule G(8)(c)(ii)(A), 2006 advisory committee's notes. If the court concludes that material issues of fact preclude a finding of summary judgment, the court may hold an evidentiary hearing, at which the claimant bears the burden of establishing standing. Id. Therefore, pursuant to the procedures set forth in Rule G, the claimant bears the burden of establishing standing at each stage of the litigation, according to the applicable evidentiary requirements of that stage. Id.; see also United States v. $960,000 in U.S. Currency, 307 Fed. Appx. 251, 255 (11th Cir. 2006); $138,381, 240 F. Supp. 2d at 231 ("When the government moves for summary judgment in a forfeiture proceeding, [a] claim of ownership will be scrutinized in a manner consistent with the principles of Rule 56 of the Federal Rules of Civil Procedure."); United States v. Real Prop. Located at 5208 Los Franciscos Way, 385 F.3d 1187, 1192 (9th Cir. 2004) (on summary judgment, "[b]ecause the government met its initial burden of presenting evidence from which a trier of fact could conclude that [claimants lacked standing], the burden shifted to [claimants] to demonstrate a triable issue of material fact").[2]

---

[2] Rule G was added to the Supplemental Rules by Congress in 2006 and became effective on December 1, 2006. In a case decided prior to the adoption of Rule G, the Second Circuit stated

2.    **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), "[a] party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a).  Under Rule 56(c), a court will grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  "A fact is material . . . when it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (internal citation and quotation marks omitted).  In determining whether summary judgment is appropriate, the Court must draw all inferences in favor of the nonmoving party.  United States v. Collado, 348 F.3d 323, 327 (2d Cir. 2003).  The moving party meets its burden "by showing that little or no evidence may be found in support of the non-moving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994).   Once the moving party has provided sufficient evidence to support a motion for summary judgment, "the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles." Major League Baseball Props., Inc. v. Salvino, Inc., 542

---

that the "function of standing in a forfeiture action is . . . truly threshold only," requiring the claimant to show only a "facially colorable interest." United States v. $557,933.89 More or Less, in U.S. Funds, 287 F.3d 66, 79 (2d Cir. 2002) (citation and internal quotation marks omitted) (Sotomayor, J.).  The Court also questioned in dicta whether a claimant should be required to bear the burden of proving Article III standing in a civil forfeiture action at all.  Id. at 79 n.9.  To the extent that this interpretation of the claimant's burden to prove standing conflicts with Rule G and the procedures set forth therein, it is no longer good law.  As set forth above, Rule G specifically permits the government to challenge a claimant's standing via a summary judgment motion, at which point the claimant is required to put forth an evidentiary showing sufficient to raise an issue of material fact in response to the government's motion.

F.3d 290, 310 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also Golden Pac. Bancorp. v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004). The nonmoving party may not rely on conclusory allegations or speculation and must show that "its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999). Evidence presented by the non-moving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it" should not be accepted by the court for purposes of defeating a motion for summary judgment. Scott v. Harris, 550 U.S. 372, 380 (2007); accord Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

"[T]he mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980); see also Wyler v. United States, 725 F.2d 156, 160 (2d Cir. 1983) (conclusory and speculative responses cannot defeat adequately-pled motion for summary judgment). Such a dispute is not "genuine," and the party opposing summary judgment must show that there is more than a "metaphysical doubt." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 587.

**B.    Discussion**

    **1.    Dr. Chvatik Lacks Article III Standing As The Mere Beneficiary Of A Trust Holding Landlocked's Shares**

Dr. Chvatik does not have standing to challenge the forfeiture of the Peak House Funds because the only interest she has claimed is as the beneficiary of a trust that holds Landlocked's capital shares.

(Claim ¶ 1, Lester Decl. Ex. 2). This interest is insufficient as a matter of law to establish constitutional standing in this action.

For purposes of determining whether Dr. Chvatik has standing under Article III, her interest in Landlocked -- and, by reference, the Peak House Funds -- is evaluated under the law of the jurisdiction in which the interest arose. United States v. Speed Joyeros, S.A., 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006) ("the law of the jurisdiction that created the property right . . . determine[s] the [claimant's] legal interest" in the property at issue); United States v. Salti, 579 F.3d 656, 669 (6th Cir. 2009) ("[t]o determine the extent of a third party's interest, if any, in the property at issue, courts should closely analyze the law of the state (or in this case, foreign) jurisdiction" where the property right was created). In this case, because Landlocked was incorporated in the Turks and Caicos Islands (56.1 Stmt. ¶ 2), the relevant law is that of the United Kingdom. It is well-settled under the law of the United Kingdom that a shareholder does not have an interest in the specific assets of a corporation. See, e.g., Bank Voor Handel En Scheepvaart N v. Slatford, (1953) 1 Q.B. 248, 273 ("a shareholder has no property rights or interest in any of the assets of the company"); E.B.M. Co. Ld. v. Dominion Bank, (1937) 3 All E.R. 555, 564-65 (it is "of supreme importance that the distinction should be clearly marked, observed and maintained between an incorporated company's legal entity and its actions, assets, rights and liabilities on the one hand, and the individual shareholders and their actions, assets, rights and liabilities on the other hand"); Macaura v. Northern Assurance Co., 1925 AC 619, 626 ("no shareholder has any right to any item of property owned by the company, for he has no legal or equitable interest therein").

This is consistent with one of the general principles of American corporate law, that "the corporation and its shareholders are distinct entities . . . . An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . ." Dole Food Co. v. Patrickson, 538 U.S. 468, 474-75 (2003). Thus, courts have consistently found that because shareholders lack an ownership interest in any specific property belonging to a corporation, shareholders lack standing to

challenge the forfeiture of a corporation's assets. See United States v. Real Prop. Associated with First Beneficial Mortgage Corp., No. 3:08cv285, 2009 WL 1035233, at *4 (W.D.N.C. Apr. 16, 2009); United States v. Two Bank Accounts, Nos. CIV 06-4016-KES, 06-4005, 2008 WL 5431199, at *5 (D.S.D. Dec. 31, 2008); United States v. All Right, Title, and Interest in Real Property, Appurtenances and Improvements Known as 479 Tamarind Drive, No. 98 Civ. 2279 (RLC), 2005 WL 2649001, at *4 (S.D.N.Y. Oct. 14, 2005); New Silver Palace Rest., 810 F. Supp. at 443; United States v. East Carroll Corr. Sys., 14 F. Supp. 2d 851, 853-54 (W.D. La. 1998).

Dr. Chvatik's relationship to the Peak House Funds is even more attenuated than a shareholder, as she is merely the beneficiary of a trust holding Landlocked's capital shares. As such, she lacks standing to challenge the forfeiture of the Peak House Funds and the Claim should be stricken as to her alleged interest.

**2.     Claimants Lack Article III Standing Because They Did Not Exercise Dominion And Control Over Peak House**

Both Dr. Chvatik and Landlocked do not have Article III standing to challenge the forfeiture of the Peak House Funds because they are mere nominees for Kozeny, who is the true party in interest in this action. As set forth below, there can be no genuine dispute that it was Kozeny who exercised dominion and control over Peak House, not Claimants. Kozeny held himself out as the owner of Peak House, he oversaw the decoration, repair, and upkeep of the property, and he entertained guests and conducted business at Peak House. (56.1 Stmt. ¶¶ 26-32, 41-48). For these reasons, among others, the district court in the Colorado Litigation found that Kozeny was the beneficial owner of Peak House. (56.1 Stmt. ¶ 65).

Landlocked, which held title to Peak House, is nothing more than a shell company controlled by Kozeny that was designed to conceal Kozeny's ownership of the property, as the Colorado court also found. (56.1 Stmt. ¶¶ 65, 66). Landlocked shares several characteristics with other companies that were

also effectively controlled by Kozeny.  Like Oily Rock and Minaret, of which Kozeny was a director, and which he used to conduct the investments in the Azeri privatization program, Landlocked is one of numerous overseas companies incorporated by or on the instructions of the von Meiss Blum law firm. (56.1 Stmt. ¶¶ 2, 9-12).  And like Oily Rock, Minaret, and Daventree, Hans Bodmer ("Bodmer") facilitated the transfer of money at Kozeny's request in relation to the business of Landlocked, i.e., the ownership and upkeep of Peak House.  (56.1 Stmt. ¶¶ 12, 15, 25, 35-37).  In fact, Bodmer transferred millions of dollars for the benefit of Peak House at Kozeny's request.  (56.1 Stmt. ¶¶ 35, 36).  Thus, while Dr. Chvatik purports to have a "beneficial" interest in Landlocked, the undisputed evidence demonstrates that Landlocked -- like Oily Rock, Minaret, Daventree, and Harvard Capital, all of which Dr. Chvatik was also purportedly a "beneficiary" as the result of a complicated trust structure (56.1 Stmt. ¶¶ 4, 13, 16, 17) -- is Kozeny's company.

Kozeny negotiated and authorized the purchase of Peak House through communications with Heidi Houston ("Houston"), the real estate broker in Aspen who sold him the house.  (56.1 Stmt. ¶¶ 19-21).  Kozeny is listed as the buyer on a document from the closing for the purchase of Peak House that was obtained by the Government from the files of Houston's firm, Houston & O'Leary.  (56.1 Stmt. ¶ 24).  After the purchase, the utility bills for Peak House were transferred to Kozeny's name, and he immediately instructed Houston & O'Leary not to show anyone the house without his permission.  (56.1 Stmt. ¶¶ 27, 28).  Kozeny communicated directly with the manager of Peak House about ongoing construction projects and expenses, and authorized the transfer of money to pay for those expenses. (56.1 Stmt. ¶¶ 35-43).  Kozeny also hired an interior decorator to furnish and decorate Peak House, spending millions of dollars in the process.  (56.1 Stmt. ¶¶ 44-49).

As evidenced by his calendar records, Kozeny was not just an occasional visitor to Peak House. (56.1 Stmt. ¶ 29).  To the contrary, he treated it like his own residence.  He spent a significant amount of time at Peak House after it was purchased in 1997 and throughout 1998, and while there, he

entertained numerous friends and family members. (56.1 Stmt. ¶¶ 29, 30). Most notably, Kozeny held a lavish Christmas party in December 1997 at Peak House. (56.1 Stmt. ¶ 32). At the Christmas party, and on many other occasions, Kozeny used Peak House to entertain and hold business meetings with investors in the Azeri privatization scheme. (56.1 Stmt. ¶¶ 31-32). Another indicia of Kozeny's ownership of Peak House is that an inventory of the contents of the property lists many items that are obviously Kozeny's personal effects, such as items monogrammed with his initials. (56.1 Stmt. ¶ 72).

After the Azeri privatization scheme began to unravel, and investors began to confront Kozeny with allegations that they had been defrauded and deceived (56.1 Stmt. ¶ 55), it would have been clear to Kozeny that litigation was inevitable and his assets were at risk. Kozeny began working with Houston to try to sell Peak House. (56.1 Stmt. ¶ 56-59). Houston was adamant that she was the best person to sell the property. In a letter dated September 1, 1999, she wrote to Kozeny: "I believe that because I am in your court and understand the house better than any one else in Aspen, it makes me the most qualified to show and sell your home. . . . Let me do what I do best and get your home sold for you." (56.1 Stmt. ¶¶ 57) (emphasis added.). Clearly, Houston believed what the undisputed evidence demonstrates to be true: Kozeny owned Peak House, and it is he who stands to suffer injury if the proceeds from its sale are forfeited in this case.

Based on the foregoing undisputed evidence, the Court should find that Kozeny was the true beneficial owner of Peak House, and dismiss the Claim as to Dr. Chvatik and Landlocked for lack of standing.

## II.    THE COURT SHOULD APPLY THE FUGITIVE DISENTITLEMENT DOCTRINE TO DISMISS THE CLAIM

As demonstrated above, there can be no genuine dispute that Kozeny is the true party in interest in this action, and Claimants are merely nominees who have filed the Claim on his behalf. However, as a fugitive from justice in the criminal case from which this forfeiture action arises, Kozeny should

17

be barred from contesting the forfeiture pursuant to the fugitive disentitlement doctrine. Because there is also no genuine dispute of material fact as to Kozeny's status as a fugitive, the Court should grant the Government's motion for summary judgment and dismiss the Claim pursuant to the fugitive disentitlement doctrine.

### A.    The Fugitive Disentitlement Doctrine

The "disentitlement" provision of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 106-185, 114 Stat. 202 (2000), codified at 28 U.S.C. § 2466, addresses the "unseemly spectacle" of "a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction." Collazos v. United States, 368 F.3d 190, 200 (2d Cir. 2004). Section 2466 provides, in pertinent part:

> (a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person—
>> (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution-
>>> (A) purposely leaves the jurisdiction of the United States;
>>> (B) declines to enter or reenter the United States to submit to its jurisdiction; or
>>> (C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and
>> (2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.
> (b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.

28 U.S.C. § 2466(a). Where the statutory requirements are met, the decision whether to order disentitlement is discretionary. Collazos, 368 F.3d at 198.

The application of the fugitive entitlement doctrine is a threshold issue and thus should be considered before entertaining any challenge to the forfeiture by the claimant and prior to the commencement of general discovery.  See United States v. $1,474,770.00 in U.S. Currency, 538 F. Supp. 2d 1298, 1302 (S.D. Cal. 2008) ("disentitlement determinations are generally made early in the proceedings"); United States v. $6,976,934.65 Plus Interest, 478 F. Supp. 2d 30, 45 (D.D.C. 2007) (because applying the fugitive disentitlement doctrine will bar a claimant from contesting a forfeiture on any ground, the court must rule on the Government's section 2466 motion before addressing any motion filed by the claimant); United States v. 657 Acres of Land, More or Less, 978 F. Supp. 999, 1004 (D. Wyo. 1997) ("[claimant's] fugitive status prohibits him from asserting the statute of limitations defense raised in the motion to dismiss"); United States v. $340,903.32 in U.S. Currency, No. 94-0523-CIV, 1995 WL 500692, at *3 (S.D. Fla. July 11, 1995) (disallowing claim on fugitive disentitlement grounds prior to considering claimant's arguments regarding timeliness and merits of action because "[w]ithin the doctrine's meaning and purpose, [claimant] is not entitled to raise such objections to the forfeiture due to his own actions").

The underlying rationale of Section 2466 is that defendants should not be permitted to tax judicial resources to litigate civil forfeiture claims while simultaneously evading jurisdiction to avoid criminal prosecution.  That is precisely what Kozeny is attempting to do here: to use the resources of the federal courts to pursue a civil forfeiture claim through his nominees for his benefit, while knowingly evading the jurisdiction of the same federal court to avoid criminal prosecution in the related criminal case.  Therefore, the Court should dismiss the Claim.

**B.    Discussion**

In this case, there can be no dispute that the five statutory prerequisites to disentitlement are met. A warrant has been issued for Kozeny's arrest; Kozeny has knowledge of the warrant; the criminal case is related to the forfeiture action; Kozeny is not in custody in another jurisdiction; and he has

19

deliberately avoided prosecution. (56.1 Stmt. ¶¶ 80-88). Thus, Kozeny qualifies as a fugitive whose claim may be dismissed. And, as already established, Kozeny is the true party in interest behind the Claim filed by Dr. Chvatik and Landlocked in this action because, unlike Dr. Chvatik, Kozeny exercised dominion and control over Peak House, and Landlocked was merely a shell company designed to conceal his ownership interest. Thus, there is no reason that this Court should not exercise its discretion and dismiss the Claim.

### 1.    The Statutory Prerequisites To Disentitlement Are Satisfied

By its terms, Section 2466 identifies five prerequisites to disentitlement: (1) that a warrant be issued for the claimant's arrest; (2) that the claimant have knowledge of the warrant; (3) that the criminal case be related to the forfeiture action; (4) that the claimant not be held in custody in another jurisdiction; and (5) that the claimant have deliberately avoided prosecution. Collazos, 368 F.3d at 198. Kozeny clearly satisfies each of the criteria outlined in the statute and qualifies as a fugitive whose claim may be dismissed.

With respect to the first and second criteria, there can be no dispute that a warrant has been issued for Kozeny's arrest and that he is aware that he is wanted in the United States on the charges in the Indictment, because he was in fact arrested in the Bahamas on a provisional arrest warrant. (56.1 Stmt. ¶ 83). Nor can there be any dispute that this forfeiture action is related to the pending criminal case. In Collazos, the court held that the relatedness requirement of Section 2466 is satisfied if the two cases arise out of the same facts, circumstances and illegal activity, or if the forfeiture allegation in the criminal case seeks forfeiture of the same property. See United States v. Contents of Account No. 68108021, 228 F. Supp. 2d 436, 440 (S.D.N.Y. 2002), aff'd, 368 F.3d 290 (2d Cir. 2004). Here, the Complaint tracks much of the language of the Indictment. (Compare Complaint, Lester Decl. Ex. 1 with Indictment, Nesland Decl. Ex. 17). Moreover, the forfeiture allegation of the Indictment provides

notice that the property subject to forfeiture in the criminal case includes the Peak House Funds.
(Indictment ¶ 83, Nesland Decl. Ex. 17).

The fourth requirement, that the claimant not be confined or held in custody in any other
jurisdiction for commission of criminal conduct in that jurisdiction, is satisfied here because Kozeny
is not in custody. (56.1 Stmt. ¶ 87). See 479 Tamarind Drive, 2005 WL 2649001, at *3 (if claimant
forfeited right to contest extradition, he was free to leave foreign country; "[t]herefore, the conditions
of his release on bond do not preclude the court from subjecting [claimant] to fugitive disentitlement").
Although Kozeny spent some time in custody in the Bahamas while the extradition proceedings were
pending, he was released in 2007, and he is able to come to the United States, should he choose to do
so. (56.1 Stmt. ¶¶ 84, 87).

The fifth requirement -- that the claimant have deliberately avoided prosecution -- is
satisfied because, despite knowledge of the pending charges in this district, Kozeny has not come back
to the United States to face the charges, and in fact, has actively resisted extradition.[3] (56.1 Stmt. ¶ 86).

Therefore, Kozeny satisfies each of the criteria outlined in the statute, and is a "fugitive" as
defined in Section 2466(a).

### 2.    Kozeny Is The True Party In Interest In This Action

As already established above, Kozeny is the true party in interest in this action. Dr. Chvatik and
Landlocked did not exercise dominion and control over Peak House and are nothing more than
nominees or stand-ins for Kozeny himself in this action. Therefore, the Claim filed by Dr. Chvatik and

---

[3] Whether Kozeny was ever a permanent resident or citizen of the United States is irrelevant
under the statute. See Collazos, 368 F.3d at 198-200 (Section 2466 applies to defendants who
committed their crimes extraterritorially and "although they may have never set foot within the
territorial jurisdiction of the United States, know that warrants are outstanding for them and, as a
result, refuse to enter the country"); United States v. Up to $6,100,000 on Deposit in Account No.
15.5876 at Bank Julius Baer Co. Ltd., No. 07 Civ. 4430 (RJS), 2009 WL 1809992, at *4 (S.D.N.Y.
June 24, 2009) (same).

Landlocked is properly treated as a claim filed by Kozeny, and should be disallowed under the fugitive disentitlement doctrine as set forth in Section 2466.

Moreover, Subsection (b) of Section 2466 provides that a claim filed by a corporation may be disallowed "if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies." 28 U.S.C. § 2466(b). In other words, if the Court finds that Kozeny is the true party in interest and has therefore caused the claim to be filed by Landlocked, and the Court also finds that Kozeny is a fugitive within the meaning of Section 2466(a), then subsection (b) provides an alternative basis for dismissing the Claim as to Landlocked.

### 3.    The Court Should Exercise Its Discretion To Dismiss The Claim

Because Kozeny satisfies the statutory criteria set forth in Section 2466, the decision whether to order disentitlement now rests in the "sound discretion" of this Court. Collazos, 368 F.3d at 198. The Court should not permit Kozeny to avail himself of this Court's jurisdiction to claim property while knowingly evading its jurisdiction to avoid criminal prosecution. See id. at 200; United States v. All Funds on Deposit at Citigroup Smith Barney, No. 06-CV-3730 (NGG), 2007 WL 2687660, at *19 (E.D.N.Y. Sept. 10, 2007); 479 Tamarind Drive, 2005 WL 2649001, at *3.

Although the authority to order disentitlement is discretionary, "courts generally have not been sympathetic to fugitives who have refused to enter or re-enter the United States to answer criminal charges." Stefan A. Cassella, Asset Forfeiture Law in the United States, § 9-2, at 313 (2007). See, e.g., Collazos, 368 at 201-04; $6,100,000, 2009 WL 1809992, at *5 (court expressed "not a moment's reservation in enforcing CAFRA's fugitive disentitlement provision on the facts presented," where claimant faced pending securities fraud charges but refused to enter the United States); United States v. $1,278,795, No. Civ. A. L-03-87, 2006 WL 870364, at *1-2 (S.D. Tex. Mar. 30, 2006) (dismissing claim because warrant had issued and claimant fled in order to avoid prosecution); United States v. One 1988 Chevrolet Cheyenne, 357 F. Supp. 2d 1321, 1332 (S.D. Ala. 2005) ("the issue today

22

is whether [claimant] should be permitted to avail himself of the jurisdiction of this Court to reclaim property that he claims belongs to him even as he disrespects the jurisdiction of this Court to institute criminal proceedings against him based on his alleged criminal activities involving that very property"); 479 Tamarind Drive, 2005 WL 2649001, at *3 ("As a fugitive from justice, [claimant] has demonstrated such disrespect for the legal processes that he has no right to call upon the court to adjudicate his claim") (quotation marks omitted); United States v. All Right, Title, and Interest in Real Prop. and Appurtenances Located at Trump World Towers, No. 03 Civ. 7967 (RCC), 2004 WL 1933559, at *2 (S.D.N.Y. Aug. 31,2004) ("a claimant may not use the resources of a federal court for personal benefit while knowingly evading the jurisdiction of the same court to avoid criminal prosecution"); United States v. 10 Meadow Lane, No. CRIM. 104CV272, 2005 WL 1530252, at *1-*2 (N.D. W. Va. June 6, 2005) (summary judgment granted against fugitive who successfully fought extradition); $138,381, 240 F. Supp. 2d at 226 (granting summary judgment to government because claimant was a fugitive as defined by statute).

The disrespect to the judicial process that Kozeny has shown by refusing to appear in this district to answer the criminal charges against him is itself sufficient grounds to preclude him from using the Court's resources to appear in this related case and challenge the forfeiture. Thus, the Court should exercise its discretion and apply the fugitive disentitlement doctrine in favor of the Government "to protect the integrity of the judicial process." 149 Tamarind Drive, 2005 WL 2649001, at *3.

## III.    THIS COURT LACKS JURISDICTION TO HEAR CLAIMANTS' ARGUMENT THAT THIS ACTION IS UNTIMELY AND, IN ANY EVENT, THE ACTION IS NOT TIME BARRED

The sole basis for Claimants' motion for summary judgment is that this civil forfeiture action was filed outside the applicable statute of limitations. As explained in Part I.A., supra, before reaching the merits of Claimants' argument on this point, the Court must determine whether the Claimants have Article III standing to challenge the forfeiture. If the Court determines that Claimants have no standing,

it should strike the Claim without consideration of the statute of limitations question because a lack of standing divests the Court of jurisdiction over the Claim.[4] If the Court decides to dismiss the Claim based on the fugitive disentitlement doctrine, it also need not reach the issue of statute of limitations. However, even if the Court fails to grant the Government's motion to strike or for summary judgment, the Court should deny Claimants' motion for summary judgment. The applicable limitations period has been tolled during the time of Kozeny's absence from the United States and, therefore, this action is timely. Alternatively, the Court should invoke the doctrine of equitable tolling in favor of the Government and allow the action to proceed.

### A. Applicable Law

The governing statute of limitations is codified at 19 U.S.C. § 1621, which provides, in pertinent part:

> No suit or action to [effectuate] any . . . forfeiture of property . . . shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later; except that—
>
> * * *
>
> (2) the time of the absence from the United States of the person subject to the penalty or forfeiture . . . shall not be reckoned within the 5-year period of limitation.

19 U.S.C. § 1621 (emphasis added).

Because the statute of limitations is an affirmative defense, Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2007), the claimant in a civil forfeiture action ultimately bears the burden of proof on any factual issue necessary to determine when the limitations period began to run and when it expired.

---

[4] As already explained above, Supplemental Rule G(8)(c)(ii)(A) and the advisory committee's notes thereto provide that if the Government moves to strike a claim for lack of standing, the Court must resolve that motion before turning to the claimant's motion to dismiss the action, because "[a] claimant who lacks standing is not entitled to challenge the forfeiture on the merits." Rule G(8)(c)(ii)(A) 2006 advisory committee's note.

United States v. One Parcel of Real Prop. with Bldgs., Appurtenances and Known as 170 Westfield Drive, 34 F. Supp. 2d 107, 119 (D.R.I. 1999).

**B.      Discussion**

      **1.      Kozeny's Absence From The United States Tolls The Statute Of Limitations**

Section 1621 explicitly provides that "the time of the absence from the United States of the person subject to the penalty or forfeiture . . . shall not be reckoned within the 5-year period of limitation." 19 U.S.C. § 1621(2). In this case, the "person subject to the penalty or forfeiture" is Kozeny, because his criminal acts serve as the basis for the forfeiture of the Peak House Funds. Thus, under the plain language of the statute, the time during which Kozeny has been absent from the United States is not counted towards the limitations period. Where the statute's language is "plain, 'the sole function of the courts is to enforce it according to its terms.'" United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) (citation omitted); see also Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). In this case, it is undisputed that Kozeny has been in the Bahamas since at least early September 2000. (56.1 Stmt. ¶ 84). Therefore, even assuming that Claimants are correct that the Government discovered the offenses that form the basis for the forfeiture in this action or Peak House's involvement in those offenses at or about that same time, this action is still timely because of Kozeny's absence from the United States.

Both the Third Circuit and the D.C. Circuit Courts of Appeals have considered the meaning of Section 1621(2) in the context of civil forfeiture actions and have held that "absence" simply means "not present in the United States." See Contents of Account Number 03001288 v. United States, 344 F.3d 399, 406 (3d Cir. 2003); United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 Banco Espanol de Credito, Spain, 295 F.3d 23, 27 (D.C. Cir. 2002) ("Banco Espanol").

In Banco Espanol, the D.C. Circuit held that an in rem action to forfeit drug proceeds that had been deposited into accounts located in Spain was timely because it had commenced "during the absence of the property," i.e., while the money was held in accounts outside of the United States. 295 F.3d at 27. In Contents of Account Number 03001288, the Third Circuit endorsed the reasoning of Banco Espanol and reached the same conclusion, finding that because the civil forfeiture proceedings commenced during the absence of the forfeitable property from the United States, the action was timely. 344 F.3d at 406-407. This Court should follow the holdings of the D.C. and Third Circuits and find that, because this action commenced during Kozeny's absence from the United States, it is timely.[5]

Whether Kozeny was ever a permanent resident or citizen of the United States has no bearing on whether he is absent within the meaning of the Section 1621(2), because it is undisputed that he is not present in the United States. As the Banco Espanol Court found:

> There is no particular reason . . . for stretching the word "absence" to mean something other than not present. If Congress had meant [that the property had to first be located in the United States], we would expect some reference in the statute to the act of removal, but there is none. When we ask why Congress would have wanted to toll the limitations period for [forfeitable] profits removed from this country but not for payments deposited directly in foreign accounts, no sensible answer comes to mind.

295 F.3d at 27; accord Contents of Account Number 03001288, 344 F.3d at 406.

---

[5] The Second Circuit has not considered this precise issue. The two other civil forfeiture cases that have focused on the "absence" provision of Section 1621(2) are consistent with these holdings. See United States v. 904 Toro Canyon Road, No. CIVA04CV02549EWN-OES, 2006 WL 36764, at *7-*8 (D. Colo. Jan. 5, 2006) (statute of limitations tolled as to ownership interest of fugitive); United States v. $349,370.09 in U.S. Currency, 22 Fed. Appx. 731, 733 (9th Cir. 2001) (same). But see United States v. Islip, 18 F. Supp. 2d 1047 (Ct. Int'l Trade 1998) (limitations period not tolled in suit seeking civil penalties for violations of the Tariff Act of 1930, because foreign national subject to penalty had never lived in United States).

Similarly, the fact that the Bahamian authorities have assisted the Government's attempts to extradite Kozeny to this country is irrelevant. The <u>Banco Espanol</u> Court addressed this issue as well, stating:

> Nor do we believe property in a foreign country is no longer absent from the United States simply because a foreign government is willing to assist a forfeiture action seeking its return. <u>In short, when property is not here it is absent.</u> We recognize that our reading tolls the running of the limitations period indefinitely for bringing actions against [forfeitable] proceeds located in foreign countries. But given the uncertainties of foreign cooperation, Congress may not have wanted to force the government to bring forfeiture proceedings within five years to recover such property.

<u>Id.</u> (emphasis added); <u>accord</u> <u>Contents of Account Number 03001288</u>, 344 F.3d at 407.

Moreover, because the period of Kozeny's absence from the United States for purposes of Section 1621(2) is simply the period of time during which Kozeny has not been present in the United States, it is broader than the time during which he has been a fugitive for purposes of the fugitive disentitlement doctrine. <u>See, e.g.</u>, <u>904 Toro Canyon Road</u>, 2006 WL 36764, at *7 ("The statute of limitations is tolled any time a person 'subject to the penalty or forfeiture' has been continually absent."). If Congress had intended to limit the tolling provision in Section 1621(2) to cases in which the person whose actions give rise to the forfeiture is a fugitive, it easily could have done so. But such a limitation would have thwarted the Government's ability to toll the statute in forfeiture cases where the person subject to the forfeiture was not criminally charged. By using the term "absence" rather than "is a fugitive," Congress appropriately recognized that the Government should receive the benefit of the tolling provision even in cases where the conduct of the person at issue did not rise to the level of criminal charges.[6]

---

[6] To the extent that the Court finds that there is any ambiguity in the phrase "absence from the United States," the statute should be strictly construed in favor of the Government, because the Government's right to bring suit is at issue. <u>United States</u> v. <u>Domino Sugar Corp.</u>, 349 F.3d 84, 88 (2d Cir. 2003).

For all of these reasons, the period of Kozeny's absence from the United States, i.e., the period since September 2000, should not be included in a calculation of the limitations period. Therefore, this action is timely.

### 2. The Court Should Invoke The Doctrine Of Equitable Tolling In Favor Of The Government

Even if the Court disagrees that Kozeny's absence from the United States tolls the statute of limitations under Section 1621(2), the Court should invoke the doctrine of equitable tolling and treat the Government's action as timely.

"'Equitable tolling . . . permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity,' even when the limitations period would otherwise have expired." United States v. All Funds Distributed to, or on behalf of, Edward Weiss, 345 F.3d 49, 54 (2d Cir. 2003) ("Weiss") (citation omitted); see also M.D. v. Southington Bd. of Educ., 334 F.3d 217, 223 (2d Cir. 2003) ("We have defined equitable tolling rules as those that allow or require a court 'under compelling circumstances, [to] make narrow exceptions to the statute of limitations in order to prevent inequity.'") (citation omitted). The fact that Section 1621 "provides for express tolling in some circumstances but does not preclude equitable tolling," gives rise to the inference that Congress intended for parties to receive the benefit of equitable tolling where appropriate. Longenette v. Krusing, 322 F.3d 758, 768-69 (3rd Cir. 2003).

Equitable tolling is appropriate in this case because of the particular circumstances that affected the timing of the filing of the Government's civil forfeiture action against the Peak House Funds, all of which are undisputed, and the fact that the Government has acted with due diligence to preserve its right to seek forfeiture. Peak House was first restrained in June 2000 as a result of the preliminary

injunction entered by Judge Babcock in the Colorado Litigation.[7] (56.1 Stmt. ¶ 63). When Peak House was sold in 2001, the proceeds from the sale remained restrained. (56.1 Stmt. ¶ 73). On May 12, 2005, the Government obtained a sealed Indictment against Kozeny in which the Peak House Funds were alleged to be subject to forfeiture. (Indictment ¶ 83, Nesland Decl. Ex. 17). On October 20, 2005, within two weeks of the unsealing of the Indictment, the Government wrote a letter to Judge Babcock, informing him that the Peak House Funds were subject to forfeiture in the criminal case. (56.1 Stmt. ¶ 90).

When the Colorado Litigation was resolved by agreement of the parties in March 2009, Judge Babcock ordered that the Government be given notice of the fact that the Peak House Funds would be released from restraint in thirty days. (56.1 Stmt. ¶ 91). Less than thirty days later, on April 6, 2009, the Government filed the instant action.[8] Arguably, it would have been improper for the Government to file its civil forfeiture action any earlier, given that the Peak House Funds were subject to the jurisdiction of the Colorado court until that proceeding was resolved. See Weiss, 345 F.3d at 58 (noting that because funds held in ERISA plan could not be seized and thereby brought within the jurisdiction of the court, "it likely would have been an abuse of discretion for a court to have allowed the [civil in rem forfeiture] action to proceed"). Therefore, because the Government has consistently acted with due diligence to preserve its interest in the Peak House Funds, equitable tolling is appropriate.

---

[7] Claimants do not argue that the Government was aware of the existence of Peak House or the offenses giving rise to the forfeiture of the Peak House Funds prior to the entry of the preliminary injunction.

[8] Approximately one month before the Colorado Litigation was resolved, on February 11, 2009, the Government filed an application for an ex parte post-indictment restraining order in the criminal case, which was granted by Judge Scheindlin. (Nesland Decl. Ex. 3).

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion to strike or for summary judgment and dismiss the Claim for lack of standing or, alternatively, on the basis of the fugitive disentitlement doctrine. In the event that the Court reaches the statute of limitations issue, it should deny Claimants' motion for summary judgment because the statute has been tolled during the period of Kozeny's absence from the United States. Alternatively, the Court should invoke the doctrine of equitable tolling and find that the instant civil forfeiture action is timely.

Dated: New York, New York
       November 23, 2009

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney
                         for the Southern District of New York
                         Attorney for Plaintiff
                         United States of America

By:   _____
       Amy Lester (AL-3398)
       Assistant United States Attorney
       One St. Andrew's Plaza
       New York, New York 10007
       Tel.: (212) 637-2416
       Fax: (212) 637-0421