UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :        09 Civ. 3481 (HB)

              Plaintiff,                 :

         - v. -                          :

ANY AND ALL FUNDS ON DEPOSIT IN              :
ACCOUNT NO. 12671905, HELD IN THE
NAME OF LANDLOCKED SHIPPING                  :
COMPANY AT WELLS FARGO BROKERAGE
SERVICES, LLC, AND ALL INTEREST AND          :
OTHER PROCEEDS TRACEABLE THERETO,

                                    :

ANY AND ALL FUNDS ON DEPOSIT IN
ACCOUNT NO. 0578010886, HELD IN THE          :
NAME OF LANDLOCKED SHIPPING
COMPANY AT WELLS FARGO BANK, N.A.,           :
AND ALL INTEREST AND OTHER PROCEEDS
TRACEABLE THERETO, and                       :

ONE MERCEDES S600 FOUR-DOOR SEDAN,           :
BEARING VEHICLE IDENTIFICATION
NUMBER WDBGA57G5XA421548,                     :

          Defendants-in-rem.             :

------------------------------------------------------------------x

**RESPONSES BY PLAINTIFF UNITED STATES OF AMERICA
TO CLAIMANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF ADDITIONAL
MATERIAL FACTS PERTINENT TO CLAIMANTS' STANDING**

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the

Southern and Eastern Districts of New York, plaintiff United States of America (the "Government")

submits these responses to Claimants Landlocked Shipping Company and Dr. Jitka Chvatik's

Statement of Additional Material Facts Pertinent to the Claimants' Standing dated December 30,

2009.[1]

## GENERAL OBJECTION

The Government objects to the Declaration of Dr. Jitka Chvatik dated December 16, 2009, which is cited as the sole support for many of Claimants' purportedly undisputed facts. First, Dr. Chvatik's Declaration includes many details that are not based on her personal knowledge and are therefore inadmissible pursuant to Federal Rule of Evidence 602. Second, many of Dr. Chvatik's factual assertions are unsupported by the documents attached to her Declaration and are in fact contradicted by the documents submitted by the Government in support of its motion to strike or for summary judgment. These assertions cannot create a genuine issue of material fact sufficient to defeat summary judgment. See Scott v. Harris, 550 U.S. 372, 380 (2007) (evidence presented by the non-moving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it" should not be accepted by the court for purposes of defeating a motion for summary judgment); accord Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party."); Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (nonmoving party may not rely on conclusory allegations or speculation and must show that "its version of the events is not wholly fanciful"). Finally, Dr. Chvatik's Declaration is rampant with improper arguments and legal conclusions, which have no place in Rule 56.1 statements. See Rodriguez v. Schneider, No. 95 Civ. 4083 (RPP), 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("Rule 56.1 statements are not argument . . . . They should not contain conclusions."); Loc.

---

[1] These facts are included in the Responses by Claimants Landlocked Shipping Company and Dr. Jitka Chvatik to Plaintiff United States of America's Local Civil Rule 56.1 Statement, beginning at page 33.

Civ. R. 56.1(a) (requiring "short and concise statement . . . of the material facts as to which . . . there is no genuine issue to be tried").

## RESPONSES

93.    Dr. Chvatik was born in Czechoslovakia. In 1980, when Czechoslovakia was still a Communist country, she and her husband gave up their Czech citizenship, emigrated to Germany with their two children, and became German citizens.

<u>Response</u>:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

94.    In 1994, Dr. Chvatik gave up practicing medicine and moved with her husband to Monaco, where she currently resides, in order to take control over her father's business affairs.

<u>Response</u>:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

95.    When Czechoslovakia began privatizing formerly state-owned businesses in 1990 following the collapse of the Soviet Union, Dr. Chvatik's father, Frantisek Stehlik, a banker and entrepreneur, formed a number of private companies in which he was the sole or majority shareholder to participate in the privatization program and to invest in the privatized industries and business.

<u>Response</u>:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

96.    Five of Mr. Stehlik's companies became quite successful. One employed more than 3,000 employees.

<u>Response</u>:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

97.    In 1993 Mr. Stehlik asked Dr. Chvatik to take control over his business affairs and to arrange for an estate plan that would preserve and protect his assets.  He accordingly executed a power of attorney and authorized Dr. Chvatik to act on his behalf.

Response:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

98.    To carry out her father's wishes, Dr. Chvatik searched for qualified professionals in Zurich, Switzerland, which was near her German residence and which has a reputation for assisting wealthy Europeans.  She eventually was referred to and in late 1993 retained Hans Bodmer and the von Meiss Blum firm as qualified trust and estate professionals.

Response:    Undisputed.

99.    Dr. Bodmer and his partners, Claude Blum, Florian von Meiss, and Andre Wahrenberger developed a business and estate plan that involved forming a series of separate trusts into which Mr. Stehlik's corporate shares and assets would be contributed and controlled.

Response:    Undisputed.

100.    Dr. Bodmer and his partners agreed to administer the trusts and trust assets, including the companies, on Dr. Chvatik's behalf as sole beneficiary.

Response:    Undisputed.

101.    Between December 1993 and November 1995, von Meiss Blum formed nine trusts, of which Dr. Chvatik was appointed sole beneficiary during her lifetime, into which Mr. Stehlik's assets were placed.

Response:    Undisputed.

102.    Von Meiss Blum arranged to have professional companies owned and controlled by the firm and its partners appointed to serve in the capacities of administrator and protector of the

4

trusts.

Response:    Undisputed.

103.    As of this date, seven of the nine trusts have been terminated at Dr. Chvatik's request, with the trust assets being distributed to Dr. Chvatik personally.

Response:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

104.    One of the trusts that von Meiss Blum formed in 1995 was the Caribbean Yachting Trust, whose name was later changed to the Epsilon Trust.

Response:    Undisputed.

105.    Dr. Bodmer served as protector, institutional settlor, and administrator of the Epsilon Trust.

Response:    Undisputed.

106.    Dr. Chvatik was appointed sole beneficiary during her lifetime of the Epsilon Trust.

Response:    Undisputed.  The Government notes that Viktor Kozeny was the second beneficiary of the Epsilon Trust, who would be appointed as the sole beneficiary upon the death of Dr. Chvatik.  (Letter of Wishes at 2, Chvatik Decl. Ex. C).[2]

107.    Claimant Landlocked Shipping Company, incorporated in October 1995, was one of several companies that von Meiss Blum formed while serving as administrator of the Epsilon Trust.

Response:    Undisputed.

---

[2] "Chvatik Declaration" or "Chvatik Decl." refers to the Declaration of Dr. Jitka Chvatik dated December 16, 2009; "Quelch Declaration" or "Quelch Decl." refers to the Declaration of Ervine M. Quelch dated December 17, 2009; "Government's Rule 56.1 Statement" or "Govt. Rule 56.1 Stmt." refers to the Local Civil Rule 56.1 Statement of Undisputed Material Facts in Support of Motion to Strike or for Summary Judgment by Plaintiff United States of America dated November 24, 2009.

108.    Von Meiss Blum instructed Chopin, Miller & Yudenfreund ("Chopin Miller"), a law firm in West Palm Beach, Florida, to form Landlocked.

Response:    Undisputed, except to the extent that Claimants' rely on paragraph 12 of the Chvatik Declaration, which is not based on personal knowledge. See General Objection, supra at 2.

109.    Chopin Miller instructed Ervine Quelch of Morris Cottingham Associates to incorporate Landlocked as a Turks and Caicos company.

Response:    Undisputed, except to the extent that Claimants' rely on paragraph 12 of the Chvatik Declaration, which is not based on personal knowledge. See General Objection, supra at 2.

110.    Morris Cottingham had provided corporate management and administration services to Chopin Miller for many years.

Response:    Undisputed, but not relevant or material to the issues to be decided on summary judgment.

111.    When Morris Cottingham formed Landlocked, Apollo Nominees Limited was appointed through a Declaration of Trust to hold Landlocked's shares in trust for Dr. Chvatik as sole beneficiary and principal.

Response:    Disputed to the extent that the documents cited in the Chvatik Declaration in support of this statement -- the Declaration of Trust and the Minutes of the First Meeting of the Board of Directors of Landlocked (Chvatik Decl., Exs. D and E) -- do not mention Dr. Chvatik by name and therefore do not indicate that Landlocked's shares were held in trust for Dr. Chvatik's benefit at this time. The first document in the record demonstrating that Landlocked's shares were held in trust for Dr. Chvatik is the January 14, 1999 Declaration of Trust. (Quelch Decl., Ex. I).

6

112.    Apollo Nominees Limited continues to hold the shares of Landlocked in trust for Dr. Chvatik as sole beneficiary.

Response:    Disputed to the extent that word "continues" implies that Landlocked's shares were held in trust for Dr. Chvatik's benefit from the time of Landlocked's formation, which is not supported by the evidence in the record, as explained above.

113.    In 1997, Dr. Chvatik decided to purchase Peak House.

Response:    Disputed. This self-serving statement by Dr. Chvatik is unsupported by the documents attached to her Declaration as Exhibit F, which do not mention Dr. Chvatik by name and do not indicate that she exercised any role in the decision to purchase Peak House. This statement is also contradicted by documents which demonstrate that Kozeny was in communications with the real estate firm of Houston & O'Leary about the purchase of Peak House, which documents do not mention Dr. Chvatik. (Govt. Rule 56.1 Stmt. ¶¶ 20-21).

114.    Dr. Chvatik's interest in purchasing a mountain and ski resort retreat for herself and her family started in 1996, when she looked for mountain properties in Suvretta, St. Moritz and Pontresina, three exclusive Swiss ski resorts located in the Alps.

Response:    Disputed. This statement is unsupported by any evidence other than Dr. Chvatik's self-serving Declaration, which is not sufficient to create a genuine issue of material fact on summary judgment. See General Objection, supra at 2.

115.    In January and July 1996 Dr. Chvatik also made trips to ski resorts in the Rocky Mountains -- Jackson Hole, Wyoming and Aspen and Vail, Colorado.

Response:    Undisputed.

116.    Dr. Chvatik learned of Peak House while she was undergoing medical treatment at the Mayo Clinic in Rochester, Minnesota, to which she was admitted in October 1996 and January,

March, April, and May 1997.

    Response:    Undisputed.

    117.    When Dr. Chvatik's son Viktor informed her that he and his family would be skiing and vacationing in Aspen in March 1997, Dr. Chvatik asked him if he would look for mountain properties that might be of interest to her since she had decided that acquiring property and building a home in Switzerland was more complicated than she had expected and that Aspen may be much easier and an even better area to own a vacation home.

    Response:    Disputed.  This statement is unsupported by any evidence other than Dr. Chvatik's self-serving Declaration, which is not sufficient to create a genuine issue of material fact on summary judgment.  See General Objection, supra at 2.  This statement is also contradicted by documents which demonstrate that Kozeny was in communications with the real estate firm of Houston & O'Leary about the purchase of Peak House, which documents do not mention Dr. Chvatik.  (Govt. Rule 56.1 Stmt. ¶¶ 20-21).

    118.    In March 1997, Kozeny told Dr. Chvatik about Peak House, which he had previewed and described as an "Aspen Jewel" that had been designed by a famous architect and student of Frank Lloyd Wright.

    Response:    Undisputed.

    119.    Kozeny informed Dr. Chvatik that he had learned from the real estate agent listing Peak House that the owner was in discussions with potential buyers and that she would have to act quickly if she liked the house.  He also sent her a brochure about the architect as well as an extensive book with photographs describing Peak House, its design, its features, and its uniqueness as a retreat even in Aspen, which she knew from her visit and study was one of the premier resorts in the world.

    Response:    Disputed.  This statement is unsupported by any evidence other than Dr.

Chvatik's self-serving Declaration, which is not sufficient to create a genuine issue of material fact on summary judgment. See General Objection, supra at 2. This statement is also contradicted by documents which demonstrate that Kozeny was in communications with the real estate firm of Houston & O'Leary about the purchase of Peak House, which documents do not mention Dr. Chvatik. (Govt. Rule 56.1 Stmt. ¶¶ 20-21).

120.    Dr. Chvatik immediately recognized that Peak House would be an extraordinary investment to add to the portfolio of properties she already had acquired through various trusts. She also decided that it would be more accommodating for her family with whom she wanted to share the use of the home, since Kozeny, his wife Ludka, and their two daughters, Dr. Chvatik's grandchildren, were residing in Nassau, Bahamas, and her son Daniel and his girlfriend Katarina would be residing in Boston where Daniel had decided to attend M.I.T.

Response:    Disputed. This statement is unsupported by any evidence other than Dr. Chvatik's self-serving Declaration, which is not sufficient to create a genuine issue of material fact on summary judgment. See General Objection, supra at 2.

121.    After deciding to purchase Peak House, Dr. Chvatik contacted Dr. Bodmer to tell him that Viktor had located a ski home that she wanted to purchase in Aspen named Peak House, and asked Dr. Bodmer to have one of the trusts acquire Peak House. Dr. Bodmer agreed and said he would arrange for the purchase.

Response:    Disputed. This statement is based only on Dr. Chvatik's self-serving Declaration and is not supported by any citations to documents or other admissible evidence. See General Objection, supra at 2.

122.    In accordance with Dr. Chvatik's wishes, Dr. Bodmer engaged Chopin Miller to represent Landlocked in the purchase of Peak House. Chopin Miller drafted and executed the May

30, 1997 purchase contract as well as the closing documents for the June 5, 1997 purchase.

Response:    Disputed in part. The statement "[i]n accordance with Dr. Chvatik's wishes" is based only on Dr. Chvatik's self-serving Declaration and is not supported by any citations to documents or other admissible evidence. See General Objection, supra at 2.

123.    Because Dr. Chvatik was debilitated from her medical treatment and surgery, she asked Kozeny to work with Bodmer and Chopin Miller to arrange for the purchase of Peak House. Kozeny agreed to do so and communicated with Dr. Chvatik frequently about the progress of the purchase.

Response:    Disputed.    This statement is based only on Dr. Chvatik's self-serving Declaration and is not supported by any citations to documents or other admissible evidence. See General Objection, supra at 2.

124.    Dr. Chvatik agreed to make an offer of $19,750,000 to purchase Peak House (including furniture and furnishings) and it was accepted.

Response:    Disputed.    This statement is based only on Dr. Chvatik's self-serving Declaration and is not supported by any citations to documents or other admissible evidence. See General Objection, supra at 2. This statement is also contradicted by documents which demonstrate that Kozeny was in communications with the real estate firm of Houston & O'Leary about the purchase of Peak House, which documents do not mention Dr. Chvatik. (Govt. Rule 56.1 Stmt. ¶¶ 20-21).

125.    Dr. Chvatik was informed in meetings with Dr. Bodmer and von Meiss Blum and from documents that they provided to her after the purchase that the purchase was accomplished through Landlocked, a company held within the Epsilon Trust.

Response:    Disputed. The documents attached to Dr. Chvatik's Declaration as Exhibit

J in support of this statement do not relate to the purchase of Peak House, but rather to the purchase of a different property. (Compare Assignment and Acceptance of Contract, Chvatik Decl., Ex. J, which refers to contract of sale to buy property dated June 6, 1997 between Landlocked and the Ayers Family Trust with Contract of Sale for Peak House dated May 30, 1997 between Landlocked and the Normanstone Foundation, included in Closing Documents, Chvatik Decl., Ex. F).

126.    At various times during and after 1997, Dr. Bodmer, his partners, and Werner Niedermann (who was director of one of the other trusts), confirmed and provided documents and schematics that reflected that Peak House was owned by Landlocked as an asset of the Epsilon Trust.

Response:    Undisputed.

127.    Dr. Chvatik, her husband, and her son Daniel vacationed at Peak House frequently from 1997 through 2000. Dr. Chvatik usually spent time at Peak House every month during the ski season and every other month in the off-season.

Response:    Disputed to the extent that this statement is supported only by Dr. Chvatik's self-serving Declaration. See General Objection, supra at 2.

128.    One of the reasons that Dr. Chvatik purchased Peak House was for her sons Viktor and Daniel to use the property. Except from reviewing documents produced by the Government in this litigation, however, Dr. Chvatik was unaware of the dates or lengths of Kozeny's stays at Peak House.

Response:    Disputed to the extent that this statement suggests that Dr. Chvatik purchased Peak House, which is supported only by Dr. Chvatik's self-serving statements in her Declaration and is contradicted by the evidence cited in support of the Government's Rule 56.1 Statement. See General Objection, supra at 2.

129.    In 1998 Kozeny asked if he could make some interior changes to Peak House (the

costs of which he agreed to pay) to accommodate his wife Ludka and their two children and Dr. Chvatik agreed. She was not aware of the amounts he spent until 1999 when a contractor sued Landlocked for non-payment, at which point Dr. Chvatik hired and paid Chopin Miller to represent Landlocked to settle the litigation.

Response:    Disputed to the extent that this statement asserts that Kozeny asked Dr. Chvatik for permission to make interior changes to Peak House and that Dr. Chvatik hired and paid Chopin Miller to settle litigation resulting from Landlocked's non-payment of a contractor. These assertions are supported only by Dr. Chvatik's self-serving statements in her Declaration and are contradicted by the evidence cited in support of the Government's Rule 56.1 Statement. See General Objection, supra at 2.

130.    In late 1998 and early 1999, Dr. Chvatik became concerned about the expenses of maintaining Peak House. In January 1999, she went to Aspen, met with Heidi Houston (the real estate agent involved in Landlocked's purchase of Peak House), and decided that Peak House should be rented and, in addition, offered for sale.

Response:    Disputed. This statement is based only on Dr. Chvatik's self-serving Declaration and is not supported by any citations to documents or other admissible evidence. See General Objection, supra at 2.

131.    Dr. Chvatik asked Dr. Bodmer to authorize her personally to pursue the rental and sale of Peak House. He agreed, and in March 1999 issued instructions to Chopin Miller to assist and secure my approval on agreements relating to Peak House.

Response:    Disputed to the extent that this statement is supported only by Dr. Chvatik's self-serving Declaration. See General Objection, supra at 2.

132.    From 1999 to 2001, Dr. Chvatik approved several rentals of Peak House. She also

12

continued to use it for vacations when it was unrented.  The leases were prepared and executed on behalf of Landlocked with Dr. Chvatik's approval by Chopin Miller.

Response:    Disputed to the extent that this statement is supported only by Dr. Chvatik's self-serving Declaration.  See General Objection, supra at 2.

133.    Because of Dr. Chvatik's decision to rent Peak House, she had Chopin Miller with the assistance of Price Waterhouse Coopers prepare U.S. and Colorado income tax returns of a foreign corporation to report Landlocked's receipt of rentals.  Dr. Chvatik signed the returns.

Response:    Disputed to the extent that this statement asserts that Dr. Chvatik decided to rent Peak House, which is supported only by Dr. Chvatik's self-serving Declaration.  See General Objection, supra at 2.

134.    In 2001, Dr. Chvatik decided to sell Peak House.

Response:    Disputed to the extent that this statement asserts that Dr. Chvatik decided to sell Peak House, which is supported only by Dr. Chvatik's self-serving Declaration.  See General Objection, supra at 2.  The documents cited by Claimants in support of this statement (Chvatik Decl., Exs. DD and EE) do not reference Dr. Chvatik.

135.    Carrying out Dr. Chvatik's decision, Chopin Miller engaged Heidi Houston to list and broker the sale, and Chopin Miller and the firm of Hall & Evans, a Denver, Colorado law firm, prepared the contract of sale, the closing documents and closed the sale.

Response:    Disputed to the extent that this statement asserts that Dr. Chvatik decided to sell Peak House, which is supported only by Dr. Chvatik's self-serving Declaration.  See General Objection, supra at 2.  The documents cited by Claimants in support of this statement (Chvatik Decl., Exs. DD and EE) do not reference Dr. Chvatik.

136.    Apollo Nominees is obligated to pay to Dr. Chvatik any income received by

Landlocked.

Response:    Undisputed to the extent that this statement simply reflects Mr. Quelch's understanding of the obligations of Apollo Nominees Limited.

137.    Apollo Nominees receives its instructions from Dr. Chvatik or her authorized representatives. Dr. Chvatik or her authorized representatives Chopin Miller, Hall & Evans LLC, Murray Franke Greenhouse List & Lippitt, and the Law Office of James E. Nesland LLC have issued instructions on behalf of Dr. Chvatik.

Response:    Undisputed to the extent that this statement simply reflects Mr. Quelch's knowledge or lack thereof about who provided instructions on behalf of Landlocked to Apollo Nominees Limited.

138.    Were it not for the preliminary injunction in the litigation in the District of Colorado, Dr. Chvatik would have received the proceeds from the sale of Peak House in 2001 and would have been receiving the interest earned on the proceeds since 2001.

Response:    Disputed. This statement constitutes improper argument and/or a legal conclusion. See General Objection, supra at 2.

139.    Neither Landlocked nor Dr. Chvatik are "nominees" for Viktor Kozeny.

Response:    Disputed. This statement constitutes improper argument and/or a legal conclusion. See General Objection, supra at 2.

140.    Landlocked is and always has been the legal owner of Peak House and the funds on deposit from the sale of Peak House. Dr. Chvatik is and always has been the beneficial owner of Peak House and the funds on deposit at Wells Fargo.

Response:    Disputed. This statement constitutes improper argument and/or a legal conclusion. See General Objection, supra at 2.

141.    Kozeny had no interest in Peak House and has no interest in Landlocked's accounts.

Response:    Disputed.    This statement constitutes improper argument and/or a legal conclusion. See General Objection, supra at 2.

142.    Ervine Quelch, the principal of Morris Cottingham who created Landlocked and whose affiliated company Apollo Nominees Limited serves as trustee of the trust that owns Landlocked's shares Dr. Chvatik's behalf does not know, has never met, and has never received instructions from Viktor Kozeny. To the best of Mr. Quelch's knowledge, Apollo has never been instructed to appoint nor has it appointed or designated Kozeny as a principal or beneficial owner of Landlocked; has not conveyed any interest in Landlocked to Kozeny; has not issued shares in Landlocked to Kozeny; has not appointed Kozeny to serve as an officer, director, employee, or agent of Landlocked; and has not paid income or provided any benefits to Kozeny.

Response:    Undisputed to the extent that this statement simply reflects Mr. Quelch's knowledge or lack thereof about who he communicated with and received instructions from on behalf of Landlocked and/or Apollo Nominees Limited.

143.    Landlocked and Dr. Chvatik have a very real interest and personal financial stake in the outcome of this litigation, and are defending against the Government's forfeiture claim and prosecuting their claims to recover the funds to which Dr. Chvatik is entitled as ultimate beneficial owner.

Response:    Disputed.    This statement constitutes improper argument and/or a legal conclusion. See General Objection, supra at 2.

144.    Dr. Chvatik is being wrongfully deprived of the funds on deposit by the current restraining order issued on the uncontested ex parte application of the Government and it is Dr. Chvatik who would be wrongfully deprived of the funds if forfeited in this action.

15

Response:    Disputed.   This statement constitutes improper argument and/or a legal

conclusion.  See General Objection, supra at 2.

Dated: New York, New York
       January 11, 2010

                                        PREET BHARARA
                                        United States Attorney
                                        for the Southern District of New York
                                        Attorney for Plaintiff
                                        United States of America


                                  By: _____
                                        Amy Lester (AL-3398)
                                        Assistant United States Attorney
                                        One St. Andrew's Plaza
                                        New York, New York 10007
                                        Tel.: (212) 637-2416
                                        Fax: (212) 637-0421