UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,                                    :
                                                             :
                      Plaintiff,     :
                                                             :   09 CV 3481 (HB)
        - against -                                      :
                                                             :   OPINION &
ANY AND ALL FUNDS ON DEPOSIT IN ACCOUNT                      :   ORDER
NO. 12671905, HELD IN THE NAME OF                            :
LANDLOCKED SHIPPING COMPANY AT WELLS                         :
FARGO BROKERAGE SERVICES, LLC, AND ALL                       :
INTEREST AND OTHER PROCEEDS TRACEABLE                        :
THERETO,                                                     :
                                                             :
ANY AND ALL FUNDS ON DEPOSIT IN ACCOUNT                      :
NO. 0578010886, HELD IN THE NAME OF                          :
LANDLOCKED SHIPPING COMPANY AT WELLS                         :
FARGO BANK, N.A., AND ALL INTEREST AND                       :
OTHER PROCEEDS TRACEABLE THERETO, and                        :
                                                             :
ONE MERCEDES S600 FOUR-DOOR SEDAN,                           :
BEARING VEHICLE IDENTIFICATION NUMBER                        :
WDBGA57G5XA421548                                            :
                                                             :
                    Defendants-in-rem.  :
                                                             :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      In this action, the United States Government seeks forfeiture of a vehicle and funds from the sale of a multi-million dollar chateau allegedly connected to the criminal activity of Victor Kozeny. In 2005, Kozeny was indicted for, *inter alia*, money laundering and Foreign Corrupt Practices Act violations, but he has to date resisted extradition efforts from his residence in the Bahamas. According to the Government, Kozeny used the property at issue here, known as "Peak House," as part of a fraudulent investment scheme related to the privatization of state-owned businesses in the Republic of Azerbaijan. The claimants, Dr. Jitka Chvatik and the Landlocked Shipping Company, assert that they are the rightful owners of the funds from the sale of Peak House, and have moved to dismiss this action on summary judgment as precluded by the relevant statute of limitations. The Government cross-moved, and argues that the claimants lack standing, are barred by the fugitive disentitlement doctrine, and that the statute of

1

limitations was tolled for long enough to allow this action to proceed. For the reasons that follow, the claimants' motion is GRANTED.

## I. BACKGROUND

The United States Government ("Government") seeks to obtain the proceeds from the sale of a residential real estate property located in Aspen, Colorado. The real estate, a residence located at 2137 Red Mountain Road, was known as "Peak House," and the funds from its sale are known as the "Peak House funds." *See* Pl.'s Local Civ. R. 56.1 Stmt. of Undisputed Material Facts in Supp. of Mot. to Strike or for Summ. J. ("Pl.'s 56.1"), ¶ 19, 75. After suit was initiated, a verified claim was filed by Landlocked Shipping Company ("Landlocked"), a Turks and Caicos Islands corporation, and Dr. Jitka Chvatik ("Chvatik"), a German citizen and retired medical doctor, (collectively, "Claimants"), asserting ownership of the Peak House funds. *See* Verified Claim (May 7, 2009) (Docket No. 4).

This suit arises out of civil and criminal litigations related to the affairs of Victor Kozeny ("Kozeny"), a wealthy international businessman implicated in investment fraud, money laundering, and Foreign Corrupt Practices Act violations. Dr. Chvatik is the mother of Victor Kozeny. Pl.'s 56.1 ¶ 1. In 1997 and 1998, Kozeny became involved in a program to purchase options and vouchers issued by the Republic of Azerbaijan as part of the country's plan to privatize certain state-owned businesses. *Id.* ¶ 9.[1] Around that same time, the Peak House property in Aspen, Colorado, was purchased. The nature of the acquisition, and who ultimately owned and controlled the property, is the primary subject of dispute in this proceeding.

According to the Government, the home was purchased and controlled by Kozeny and associated corporate entities. Peak House was purchased by Landlocked for about $19.75 million on or around June 6, 1997. Pl.'s 56.1 ¶ 22. The sole shareholder of Landlocked is another corporate entity, Apollo Nominees Limited ("Apollo"). *Id.* ¶ 3. Claimants note, and the Government does not dispute, that Chvatik is the principal and sole beneficiary of Apollo, and also the sole beneficial owner of Landlocked. *Id.* ¶ 4; Quelch Decl. ¶ 7; Chvatik Decl. ¶ 12. The Government contends that Landlocked shares characteristics with other "shell" companies of which Kozeny was a director, specifically that it was incorporated by the same law firm, the

---

[1] Claimants challenge many of these facts as unsupported by admissible evidence, based primarily on hearsay, lack of knowledge, or lack of authentication. *See supra*.

2

same lawyer facilitated the transfer of money for the upkeep of the property, and that all of these companies treat Chvatik as beneficiary. Pl.'s 56.1 ¶¶ 9-17. According to the Government, another entity, "Daventree," of which Kozeny is a director, provided funds to finance the purchase of Peak House. *Id.* ¶¶ 14-16.[2] Finally, another entity, Peak House Corporation, provided transportation, maintenance, and services for Peak House. *Id.* ¶ 7. Chvatik is not a beneficiary of Peak House Corporation, and testified that she has no knowledge of who controlled it; the corporation's services for the home were often funded by corporate entities associated with Kozeny. *See id.* ¶¶ 8, 35-40.

Kozeny was involved in the purchase, use, and sale of Peak House. In 1997, he visited Aspen to view suitable properties for purchase, and spoke to Heidi Houston, a real estate broker, about purchasing the property. *Id.* ¶¶ 20-21. Kozeny is listed as the buyer of Peak House on a hand-written document from the real estate closing. *Id.* ¶ 24. The Government further claims, based on affidavits from those associated with Kozeny's investment scheme, that Kozeny held himself out to others as the owner of Peak House. *Id.* ¶ 26. Additionally, Kozeny had the water and electricity service transferred to his name, his assistant directed the real estate agent not to show the house without Kozeny's authorization, spoke to the manager of Peak House about various construction projects on the property and their funding, and retained and paid an interior design firm to decorate the home. Pl.'s 56.1 ¶¶ 27-28, 41-53. Kozeny spent parts of various months from 1997 to 1999 at Peak House, entertained guests at the residence, and conducted meetings and other events associated with the Azerbaijan investment program at the home, most notably a black tie Christmas party in 1997. *Id.* ¶¶ 29-32. In 1999, Kozeny communicated with Houston about the sale of Peak House, which ultimately occurred in 2001 for about $22 million. *See id.* ¶¶ 56-58, 70, 75. An itemized list of property of Peak House provided in connection with the sale indicates certain items monogrammed with a "K" or "VK." *Id.* ¶ 71.

Although some of the general points above are not in dispute, Claimants paint a very different picture as to how Landlocked, and by extension Chvatik, came to own and control Peak House. Claimants explain that Chvatik's father was a very successful and wealthy businessman, who asked Chvatik to take control of his business affairs and arrange for an estate plan to protect his assets. *See* Resp. by Claimants Landlocked Shipping Company and Dr. Jitka Chvatik to Pl.'s

---

[2] Claimants dispute whether the "Daventree" mentioned in testimony in support of this claim is the same entity as "Daventree Limited" a company owned by a trust of which Chvatik claims to be a beneficiary. *See* Resp. by Claimants Landlocked Shipping Company and Dr. Jitka Chvatik to Pl.'s Local Civ. R. 56.1 Stmt. ¶¶ 14-16.

Local Civ. R. 56.1 Stmt. ("Claimant's 56.1 Resp.") ¶¶ 95-98.  As part of this plan, a number of trusts were established to benefit Chvatik, one of which, the Caribbean Yachting Trust, later called Epsilon Trust, directed the formation of Landlocked in October 1995.  *Id.* ¶¶ 99-107.  As noted above, Chvatik is the beneficiary of the trust that holds the capital shares of Landlocked, and the Trustee is obligated to pay her any income Landlocked receives.  *See* Chvatik Decl. ¶¶ 11-12.  With regard to the source of the funds, Claimants assert that despite Kozeny's role as director of the Daventree trust, it was Chvatik who directed that funds from Daventree Limited be used by Landlocked to purchase Peak House.  *See* Lester Decl., Ex. 6 at 77-78 (Chvatik Dep., Oct. 30, 2009) (hereafter "Chvatik Dep."); Chvatik Decl. ¶ 19.

According to Claimants, Chvatik decided to purchase Peak House in 1997 as an investment and because of her interest in a ski resort residence.  Chvatik Dep. 77-80.  In 1996, Chvatik had been looking at residences at ski resorts in Europe, and also made visits to ski areas in the United States, including Aspen.  Claimant's 56.1 Resp. ¶¶ 114-15.  In March 1997, Kozeny informed Chvatik that he and his family would be vacationing in Aspen.  Chvatik, who was undergoing medical treatment at the Mayo Clinic in Minnesota at the time, asked him to look into properties for her.  *Id.* ¶ 116-17.  Kozeny told Chvatik about Peak House around that same time, and sent her brochures and other materials about the real estate.  *Id.* ¶ 118-19.  She asked her attorney, Dr. Hans Bodmer of von Meiss Blum, a Swiss law firm, who also allegedly performed work for Kozeny, to acquire Peak House through one of her trusts; the firm engaged a United States law firm, Chopin Miller, to represent Landlocked in the acquisition.  *Id.* ¶¶ 121-22; *see also* Pl.'s 56.1 ¶¶ 11, 18, 25.  Bodmer sent documents to Chvatik that confirmed the Peak House purchase.  Claimant's 56.1 Resp. ¶¶ 125-26.[3]

After the purchase, Chvatik made "many" vacation trips to Peak House from 1997 to 2000.  Claimant's 56.1 Resp. ¶¶ 127.  She also allowed her sons, including Victor Kozeny, to use Peak House, and even granted Kozeny permission to make changes to its interior.  *Id.* ¶¶ 128-29.  Chvatik also issued instructions to Apollo, the trustee entity that controlled Landlocked, to execute contracts to rent and, eventually, sell Peak House and invest the proceeds into Landlocked's bank account.  *Id.* ¶¶ 131-32; Quelch Decl. ¶ 13.  Chvatik also signed income tax returns on behalf of Landlocked to report receipts of the rentals.  Claimant's 56.1 Resp. ¶¶ 133.

---

[3] The Government points out that one of the two sets of documents attached in support of this contention appears unrelated to the purchase of Peak House.  *Compare* Chvatik Decl. Ex. J *with* Ex. F.

In 2001, Chvatik directed Chopin Miller, with the assistance of a real estate agent and another Colorado law firm, to sell the Peak House property. *Id.* ¶¶ 134-35.

Peak House, and later the Peak House funds, became the subject of litigation when Kozeny's investment scheme failed. In or around the summer of 1998, Kozeny told several investors in the investment program that privatization of Azerbaijan's businesses would not occur, and that their investment was worthless. Some of the investors confronted Kozeny, suspicious that they were defrauded. Pl.'s 56.1 ¶ 55. On December 17, 1999, Marlwood Commercial Inc., an entity that had purchased vouchers and options as part of Kozeny's program, filed suit against Kozeny in London and, as a result, an order was issued freezing up to $17 million of Kozeny's assets worldwide. *Id.* ¶ 59.[4] More significantly, another set of investors brought suit against Kozeny, Landlocked, and Peak House Corporation in the District of Colorado. *Id.* ¶ 62. On June 12, 2000, Federal District Court Judge Lewis T. Babcock issued a preliminary injunction that prohibited the sale, disposition, or other transfer of ownership of Peak House. *Id.* As part of this order, Judge Babcock made a series of factual findings, which concluded that there was sufficient evidence to find that Kozeny owned and controlled Peak House. *Id.* ¶¶ 63-64, 67-68. James Nesland, currently counsel for Claimants in this action, was also counsel for Kozeny in the Colorado litigation. *Id.* ¶ 69. On November 2, 2001, with Judge Babcock's authorization, Peak House was sold for $22 million with proceeds deposited in accounts held in Landlocked's name at Wells Fargo Bank, N.A. *Id.* ¶¶ 70-73, 75.

Between 2003 and 2005, a series of individuals associated with Kozeny and his Azerbaijan investment scheme pled guilty to violations of the Foreign Corrupt Practices Act ("FCPA") and conspiracy to launder money. *See* Pl.'s 56.1 ¶¶ 76-78. In 2005, pursuant to a sealed indictment, Kozeny was charged with one count of engaging in a conspiracy to violate the FCPA, twelve counts of substantive violations of the FCPA, six counts of violations of the Travel Act, one count of money laundering conspiracy, and four counts of money laundering. *Id.* ¶ 79; *see also* Sealed Indictment, *United States v. Kozeny*, No. 05 Cr. 518 (SAS) (Docket No. 1) (unsealed on Oct. 6, 2005). As part of the indictment, the Government asserted the Peak House funds were subject to criminal forfeiture. Sealed Indictment, ¶ 83(a)(v). On February 13, 2009, Judge Scheindlin issued a restraining order that prohibited the disposition of the Peak

---

[4] Marlwood also filed proceedings in the Bahamas to enforce the London order, and the High Court of the British Virgin Island placed certain corporate entities associated with Kozeny into receivership and froze all their assets. Pl.'s 56.1. ¶¶ 60-61.

5

House funds.  *See* Post-Indictment Restraining Order, February 13, 2009 (Docket No. 167).  At the time he was indicted, Kozeny resided in the Bahamas.  Pl.'s 56.1 ¶ 80.  The Government attempted to extradite Kozeny, and he was initially arrested by Bahamanian authorities, but the arrest and extradition were overturned by the Supreme Court in the Bahamas and he was released.  *Id.* ¶¶ 81-86.  As of the date that summary judgment motions were filed in this action, the decision to overturn Kozeny's extradition was pending appeal to the Court of Appeals in the Bahamas.  *Id.* ¶ 87.  Kozeny was represented by Claimant's counsel, Mr. Nesland, throughout this process.  *Id.* ¶ 88.

On October 5, 2005, the Government sent a letter to Judge Babcock in Colorado to notify him of the indictment of Kozeny, and that the Peak House funds, still restrained by a preliminary injunction, were alleged to be subject to criminal forfeiture.  Pl.'s 56.1 ¶ 89.  On March 9, 2009, Judge Babcock issued an order that terminated the preliminary injunction, lifting all restrictions on the Peak House funds, effective thirty days after notice to the United States government.  *Id.* ¶ 90.  The case was dismissed in its entirety on April 9, 2009.  *Id.* ¶ 92.

The government filed suit in this case on April 6, 2009, seeking forfeiture of the Peak House funds as well as a four-door Mercedes sedan.[5]  On May 27, 2009, Claimants moved for summary judgment, arguing that the forfeiture action is barred by the statute of limitations.  On November 23, 2009, the Government cross-moved for summary judgment, arguing that Claimants lack Article III standing to contest forfeiture, the fugitive disentitlement doctrine bars Claimants from proceeding, and that the action is timely due to either statutory or equitable tolling of the time period.  On December 30, 2009, Claimants moved to strike certain documents relied on by the Government in support of its motion as inadmissible pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, and Local Rule 56.1(d).

## II.  DISCUSSION

### A. Legal Standard

Summary judgment is warranted if the moving party shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *See Cordiano v. Metacon Gun Club, Inc.* 575 F.3d 199, 204 (2d Cir. 2009); *see also* Fed.R.Civ.P. 56(c).  A material fact is one that will affect the outcome of the suit, and a dispute about a

---

[5] Claimants do not challenge forfeiture of the Mercedes.

material fact occurs where there is sufficient evidence for a reasonable fact finder to return a verdict for the nonmoving party.  *See, e.g., Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  Evidence must be viewed in a light most favorable to the non-moving party, and all inferences must be drawn in their favor.  *See Cordiano*, 575 F.3d at 204.  A party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but … must set forth specific facts showing that there is a genuine issue for trial."  *Sista*, 445 F.3d at 169; Fed.R.Civ.P. 56(e).

### B. Standing

The Government first argues that Claimants do not have standing to challenge the forfeiture of the Peak House funds.  To contest civil forfeiture, Claimants must have standing under both the statute governing their claim and under Article III of the Constitution.  *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999).  Claimants bear the burden of demonstrating standing.  *See United States v. New Silver Palace Rest., Inc.*, 810 F. Supp. 440, 442 (E.D.N.Y. 1992) (citing *Mercado,* 873 F.2d 641, 644 (2d Cir.1989) and *United States v. Real Prop. & Improv. Located at 5000 Palmetto Drive,* 928 F.2d 373, 375 (11th Cir.1991)).  Here, the Government only disputes Claimant's constitutional standing to challenge the Peak House funds forfeiture.

Under Article III of the United States Constitution, a litigant must show a "sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Cambio Exacto*, 166 F.3d at 526-27 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 731 (1972)). In a civil forfeiture proceeding, "'the only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required facially colorable interest' in the funds sought to be forfeited."  *United States v. U.S. Currency in Sum of $660,200*, 242 Fed. Appx. 750, 751 (2d Cir. 2007) (quoting *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 (2d Cir. 2002)).  Generally speaking, "an allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture."  *Cambio Exacto,* 166 F.3d at 527; *see also Torres v. $36,256.80 U.S. Currency,* 25 F.3d 1154, 1158 (2d Cir. 1994).  Ownership and possession are significant for standing in a civil forfeiture action because they are "reliable indicators" of any injury from the seizure of the relevant property.  *See Cambio Exacto*, 166 F.3d at 527; *see also United States v. Contents of*

7

*Accounts Numbers 3034504504 and 144-07143 at Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 971 F.2d 974, 985 (3d Cir. 1992) ("Courts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable possessory interest in it."). Ownership or possession of the property is not, however, the sole, determinative factor for standing in a forfeiture action. "While ownership or possession of property may provide evidence of standing, and in some circumstances act as, in effect, a surrogate for an inquiry into whether there is injury direct enough and sufficient enough to sustain standing, it is *injury* that is at the heart of the standing question." *Cambio Exacto*, 166 F.3d at 527 (emphasis in original).

The Government contends that Claimants are, at best, nominal or "straw" owners of the Peak House funds for the real owner, Victor Kozeny. "Bare legal title" can be insufficient to demonstrate standing in a civil forfeiture action, because "appearances may be manipulated and deceptive" and it may be an "attempt to disguise … interests in property by not placing title in their own names." *United States v. One 1982 Porsche 928*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990); *see also United States v. Premises and Real Prop. with Bldgs., Appur. and Improv. at 191 Whitney Pl.*, No. 98 Civ. 0060 E, 2000 WL 1335748, at *1 (W.D.N.Y. Sept. 7, 2000) ("The rationale for this rule is to prevent individuals engaged in illegal activities from hiding their assets and circumventing the forfeiture laws by placing the legal title to property in another's name."). "A search for standing in civil forfeiture cases looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture." *One 1982 Porsche*, 732 F. Supp. at 451.

In this case, although there is substantial evidence that Kozeny was involved in the purchase and use of Peak House, Claimants have offered sufficient evidence to demonstrate constitutional standing to challenge the forfeiture action. As a preliminary matter, Claimants make somewhat persuasive arguments about the evidence used by the Government to support their claim that Kozeny is the actual owner of the Peak House funds. Most of the documentary evidence is hearsay, and, as the Government concedes, cannot be considered for the truth of the matter asserted. As such, while it is certainly useful to know that Kozeny communicated with a real estate agent and an interior decorator about Peak House, for example, the underlying contents of the communication are of little value. In addition, the affidavits of lay witnesses attesting to Kozeny's ownership of Peak House can only be credited to the extent that he held himself out as such, not that he is actually the legal owner of the property. Finally, while Judge

Babcock made certain findings of fact about Kozeny's ownership of Peak House, these findings were preliminary, and the preliminary injunction these findings were associated with was terminated without a final, judicial resolution of the action.

Certainly, as Claimants concede, Kozeny played some significant role in the purchase and use of Peak House. He found the house in Aspen, worked with the real estate agent and lawyers to purchase the property, and used it frequently and in conjunction with his business and alleged criminal activities. But Claimants provide a plausible explanation for why this is so, and present at least some credible evidence that Landlocked and Chvatik have a facially colorable interest in the Peak House funds, despite Kozeny's role. Most significantly, and not disputed by the Government, is the fact that claimant Landlocked actually purchased and sold Peak House, and the Peak House funds now reside in two of its bank accounts. While the source of the funds to purchase Peak House is somewhat ambiguous, there is no evidence that Kozeny directly controlled Landlocked. Moreover, Dr. Chvatik provided a fairly detailed narrative in both her deposition and declaration as to why she wanted to purchase a ski resort residence, how she came upon Peak House through Kozeny's efforts, why he was so involved in its purchase, maintenance and use, and how she personally used it regularly for vacation.[6] She also provides at least some documentary evidence, such as her payment of taxes and rental of the property. And while it is the corporate claimant's assets that are in question, there is little dispute that if the Landlocked funds are ever released, they are required by operation of the trust to go to Chvatik's benefit.[7] The ultimate question of Kozeny's relationship to Peak House is an open question. The present question, however, is one of standing, and "the claimant need not prove the full merits of [her] underlying claim," so long as she has demonstrated a "facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court." *$557,933.89, More or*

---

[6] The Government asks this Court not to consider Dr. Chvatik's declaration, which it argues is "self-serving" and only intended to survive summary judgment. Although a party may not manufacture material facts through the submission of an affidavit or declaration on summary judgment that is contradicted by other evidence, *see, e.g., Scott v. Harris,* 550 U.S. 372, 380 (2007); *Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999), here Chvatik's declaration is largely consistent with her deposition testimony and at least somewhat supported by additional documentary evidence. As such, it may appropriately be considered on this motion.

[7] The Government argues that a shareholder does not have legal title to any of the corporation's particular assets. While this is essentially correct, the fact of the matter is that Landlocked, the corporation that controls the Peak House funds, is itself a claimant. Moreover, as noted *supra*, and not disputed by the Government, Chvatik is entitled by operation of the trust to those funds should they become available. "[S]ubstantial economic harm is plainly the type of injury for which parties may seek redress in federal court," *Cambio Exacto*, 166 F.3d at 528, and here both claimants face that potential harm.

*Less*, 287 F.3d at 78 (quoting *Torres* 25 F.3d at 1158); *see also United States v. U.S. Currency in the Amount of $598,826.00, More or Less, And All Proceeds Traceable Thereto*, No. 00 Civ. 7073(DLI)(VVP), 2007 U.S. Dist. LEXIS 67938, at *22 (E.D.N.Y. Sept. 13, 2007).

In civil forfeiture cases where standing has been denied, the government typically has shown that the claimant has, at best, only legal title with no further evidence of dominion, possession, or interest in the property. *See, e.g., One 1982 Porsche*, 732 F. Supp. at 451 (mother's title to vehicle, where son was also on title, insufficient for standing because mother had no possession or control of the car and could not document source of money used to purchase the car); *United States v. U.S. Currency in the Amount of $18,800.00, More or Less, and All Proceeds Traceable Thereto*, No. 02 Civ. 5752(SJF)(RML), 2004 U.S. Dist. LEXIS 25055, at *10 (E.D.N.Y. Dec. 8, 2004) (no documentation that currency subject to forfeiture was either gifts or proceeds from business); *191 Whitney Pl.*, 2000 WL 1335748, at *2 (purchase of real property was only for nominal consideration, claimant never lived there, and never received rental income or made property tax payments). As the Second Circuit noted when it described exemplary cases where a claimant lacked standing, "the absence of demonstrated injury underlies them all." *Cambio Exacto*, 166 F.3d at 528. When there is some facially colorable interest demonstrated, even where another party likewise demonstrates a claim of ownership or possession, standing will still lie. *See United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 39 (1st Cir. 1999) (Claimant has standing to challenge forfeiture of joint account held in conjunction with brother, alleged gangster Whitey Bulger, because "[h]e acted as a joint owner would, writing checks and withdrawing money, and exercised dominion and control over the account."). In the present case, Claimants provide sufficient facts to show that Dr. Chvatik purchased the home through a corporation set up in trust for her benefit, used the home, and will receive the funds from its sale should they not be forfeited. Taken together, this is sufficient to show a "distinct and palpable injury" if the property is wrongly forfeited, and provide for constitutional standing. *See Cambio Exacto*, 166 F.3d at 527.

### C. Fugitive Disentitlement

The Government next argues that Claimants should be barred from challenging the civil forfeiture action due to the fugitive disentitlement doctrine. The fugitive disentitlement doctrine bars a criminal defendant from use of the resources of a federal court "while knowingly evading

10

the jurisdiction of the same court so as to avoid prosecution." *United States v. All Right, Title and Interest in Real Prop., Appur., and Improv. Known as 479 Tamarind Drive,* No. 98 Civ. 2279(RLC), 2005 WL 2649001 (S.D.N.Y. Oct. 14, 2005); *see also Gao v. Gonzales*, 481 F.3d 173, 175 (2d Cir. 2007). "Congress specifically conferred statutory authority on federal courts to order disentitlement in civil forfeiture cases." *Collazos v. United States*, 368 F.3d 190, 198 (2d Cir. 2004); *see also 479 Tamarind Drive*, 2005 WL 2649001 at *2. According to the statute, disentitlement in a civil forfeiture action may occur when:

> (1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant.

*Collazos*, 368 F.3d at 198; *see also* 28 U.S.C. § 2466. Once these requirements are met, the ultimate decision of whether to order disentitlement is within the sound discretion of the district court. *See Collazos*, 368 F.3d at 198; *479 Tamarind Drive*, 2005 WL 2649001 at *2.

In this case, the doctrine is inapplicable because the fugitive in question, Kozeny, is neither a claimant nor the majority shareholder in Landlocked. As both logic and the description of the disentitlement statute indicate, the fugitive ordinarily needs to be the claimant in the civil forfeiture action that the government seeks to disentitle. *See Callazos*, 368 F.3d at 198 ("warrant for the *claimant's* apprehension") (emphasis added). The Government provides no case law to the contrary. Additionally, while the doctrine may be applied to a claimant corporation where the fugitive is the majority shareholder, *see* 28 U.S.C. § 2466(b), Landlocked was not controlled by Kozeny. In essence, the Government is trying to make the same "strawman" argument that was dispatched above, through other means. *See* Reply Mem. of Law of Pl. at 7 ("Thus, assuming the court finds that Kozeny is the true party in interest in this action … "). For largely the same reasons described above, the Government has failed to demonstrate that Kozeny is the "true" claimant in this action, and thus I cannot apply the fugitive disentitlement doctrine to bar Claimants from proceeding in this lawsuit.

### D. Statute of Limitations

Finally, Claimants contend that the civil forfeiture proceeding is time barred.[8] The parties agree that civil forfeiture actions are subject to the general customs law statute of limitations. *See* 18 U.S.C. § 981(d) (19 U.S.C. § 1602 *et seq.* applies to civil forfeiture actions); *United States v. One 1987 Jeep Wrangler Auto.*, 972 F.2d 472, 477 n.6 (2d Cir. 1992). Consequently, a civil forfeiture action may not survive "unless such suit or action is commenced within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later." 19 U.S.C. § 1621. As noted, *supra*, this proceeding was instituted on April 6, 2009. As Claimants point out, and the Government does not dispute, a criminal indictment against Kozeny was filed on May 12, 2005, which alleges overt acts related to Peak House and also asserts criminal forfeiture of the Peak House funds. On its face, this would appear to render the present action time barred, since it was filed almost four years after the latest date in which Peak House was "discovered" to be involved in the alleged offense. The Government does not dispute this timeline, and instead argues that the statute of limitations for this action should be tolled by statute or by equity. Neither argument is persuasive.

Pursuant to 19 U.S.C. § 1621(2), the statute of limitations will be tolled during "the time of the absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property." The Government claims that, since Kozeny remains outside of the United States and the reach of the federal courts, this is sufficient to toll the time for them to file the civil forfeiture action. There is very little case law on the statutory tolling of a civil forfeiture suit. *See United States v. Contents of Account No. 03001288*, 167 F.Supp.2d 707, 715 (D.N.J. 2001)("the Court notes the paucity of case law in this area"); David Smith, Prosecution and Defense of Forfeiture Cases, 12.02 (2010) ("Because civil forfeiture cases generally do not require lengthy investigations, statute of limitation questions arise infrequently."). However, one fact that can be relatively easily gleaned from the cases that have dealt with statutory tolling is that, with respect to *in rem* actions, it is the *property*'s absence or concealment that tolls the statute. *See, e.g., United States v. One Stradivarius Kieserwetter*

---

[8] Since Claimants do not challenge forfeiture of the Mercedes Sedan, I will not consider the application of the statute of limitations to that defendant property.

*Violin*, 197 F. 157, 158 (2d Cir. 1912) ("The concealment which prevents the running of the statute must be some act *which places the property* in a situation which tends to prevent its discovery.") (emphasis added); *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 405 (3d Cir. 2003) ("Specifically, because the five-year period is tolled during the time *the property is absent* from the United States") (emphasis added); *United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito*, 295 F.3d 23, 27 (D.C. Cir. 2002) (statutory period tolled because "[t]he $4.6 million was outside the United States."). This makes logical sense, since a particular person's absence would not typically frustrate a proceeding based on *in rem* jurisdiction because, as here, the defendant property is within the control of the federal court. Indeed, the history of the tolling provision suggests that its purpose was to ensure that service of process was not frustrated by an absent person or property. *See Contents of Account No. 03001288*, 167 F. Supp. 2d at 717 (noting that the original 1875 provision stated that tolling was needed "so that the proper process may be instituted and served against such person or property therefor"). Here, with the Peak House funds located in the United States, no such concerns exist. In the few cases the Government marshaled in support of its argument, either the proceeding was not *in rem* or the absent person was the claimant, and thus the person who was absent was a party to the dispute. *See United States v. Islip*, 22 C.I.T. 852, 876-79 (Ct. Int'l Trade 1998) (individual defendant absent from United States); *United States v. 904 Toro Canyon Road*, No. CIVA04CV02549EWN-OES, 2006 WL 36764, at *8 (absent party was a claimant in civil forfeiture action). Kozeny is neither a claimant nor the defendant in this *in rem* civil forfeiture action, and as such, the statute may not be tolled based on his absence.

      Although there is already a relevant statutory tolling provision in civil forfeiture actions, the court may still consider equitable tolling of the statute of limitations. *See Longenette v. Krusing*, 322 F.3d 758, 767 (3d Cir. 2003) (noting that the Supreme Court has held that "limitations periods are subject to equitable tolling where tolling is not inconsistent with the statute"). Equitable tolling is a rare bird, and typically reserved for "extraordinary or exceptional circumstances." *United States v. All Funds Distributed To Weiss*, 345 F.3d 49, 54 (2d Cir. 2003) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)); *see also* Smith, Prosecution and Defense, 12.02[2] ("In extraordinary circumstances, a forfeiture statute of limitations may be equitably tolled to prevent inequity."). In civil forfeiture actions, it may be permitted "where the

claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period," or, more relevant to this particular case, "where the complainant [i.e. the Government] has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Alli-Balogun v. United States*, 281 F.3d 362, 367 (2d Cir. 2002) (bracketed phrase added).  Equitable tolling is determined on a case-by-case basis to prevent inequity, and the party seeking the benefit of the doctrine bears the burden of proving that tolling is appropriate.  *See Weiss*, 345 F.3d at 54.  The party must demonstrate reasonable diligence during the period sought to be tolled.  *Id.* at 55; *see also Alli-Balogun*, 281 F.3d at 369 ("Generally, courts are much less forgiving about defaults when the defaulting party (here the government) failed to exercise due diligence in preserving its legal rights.") (internal quotation omitted).

The Government claims that equitable tolling is appropriate due to the preceding preliminary injunction that was placed on Peak House.  It argues that filing for civil forfeiture would have been "improper … given that the Peak House Funds were subject to the jurisdiction of the Colorado court until that proceeding was resolved."  Mem. of Law of Pl. in Supp. at 29.  The Government, however, provides nothing that indicates they in fact could not proceed with their civil forfeiture action due to the preliminary injunction.  *See United States v. $349,370.39*, 22 Fed. Appx. 731, 734 (9th Cir. 2001) (tolling not appropriate if Government is simply negligent).  Indeed, in the criminal action against Kozeny, Judge Scheindlin issued a restraining order prohibiting the sale or disposition of the Peak House funds months before Judge Babcock ever dissolved the preliminary injunction in the Colorado litigation.  In short, the Government at a minimum could have *attempted* to file its civil forfeiture suit in a timely fashion, which would have demonstrated some diligence.

Further, once the criminal proceeding began, there is no reason why the Government could not also have brought a contemporaneous civil forfeiture claim.  Once filed, a civil forfeiture proceeding may be stayed, pursuant to federal statute, pending the resolution of the criminal action.  This could have preserved a timely filing while allowing the criminal action to move forward unaffected.  *See* 18 U.S.C. § 981(g)(1) ("Upon the motion of the United States, the court shall stay the civil forfeiture proceeding if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case."); *see also United States v. $96,100.00*, No. 06-2370-B, 2007 U.S. Dist. LEXIS 15111, at *6 (W.D.T.N. Mar. 2, 2007).  As a Tennessee federal district

14

court noted when faced with a similar argument, "[t]he bottom line is that, although the Government clearly could have filed a contemporaneous civil proceeding and sought a stay, it elected *not* to do so, choosing instead to stand by and do nothing while the statutory period expired." *$96,100.00*, 2007 U.S. Dist. LEXIS 15111, at *11 (emphasis in original). It is unfortunate that this action, which appears to have some merit and involves a substantial amount of funds, must be dismissed on procedural grounds, but there is no question that the Government learned of the Peak House funds at the very latest by 2005 and sat on its hands until 2009. As such, equitable tolling is unavailable to the Government and the action is time barred.

### III. CONCLUSION

For the reasons described above, Claimants' Motion for Summary Judgment is GRANTED.

The Clerk of the Court is instructed to close these motions and remove them from my docket.

**SO ORDERED**
August 10, 2010
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.

15